UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

ARNOLD CHEVROLET LLC, et al.,                    **MEMORANDUM OF DECISION
                                                 AND ORDER**
                        Plaintiffs,              04-CV-3097 (DRH)(WDW)


        -v.-


TRIBUNE COMPANY, NEWSDAY, INC.,
and STALUPPI HOLDING COMPANY, INC.,

                        Defendants.
_____

**Appearances:**

**For the Plaintiff:**
**Bellavia Gentile & Associates, LLP**
200 Old Country Road
Mineola, New York 11501
By: Leonard A. Bellavia, Esq.

**Law Offices of Mitchell C. Shapiro**
15 Cutter Mill Road, Suite 207
Great Neck, New York 11021
By: Mitchell C. Shapiro, Esq.

**For the Defendants Tribune Company and Newsday, Inc.:**
**Sidley Austin Brown & Wood LLP**
787 Seventh Avenue
New York, New York 10019
By: Robert W. Hirth, Esq.
    Alan M. Ungar, Esq.

**For the Defendant Staluppi Holding Company, Inc.:**
**Ruskin Moscou Faltischek, P.C.**
190 EAB Plaza
East Tower, 15th Floor
Uniondale, New York 11556-0190
By: Mark S. Mulholland, Esq.
    Jesse L. Sands, Esq.


**HURLEY, District Judge:**

        Plaintiffs Arnold Chevrolet LLC, et al. ("Plaintiffs") filed the instant action

alleging that defendants Tribune Company ("Tribune"), Newsday, Inc. ("Newsday"), and Staluppi Holding Company, Inc. ("Staluppi") (collectively, "Defendants") engaged in a conspiracy, inter alia, to charge Plaintiffs higher prices for newspaper advertising than Plaintiffs' competitors. Defendants move to dismiss the Complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). For the reasons that follow, Defendants' motions are granted in part and denied in part.

## BACKGROUND

The following facts are drawn from the Amended Complaint. Plaintiffs are owners and operators of automobile dealerships on Long Island who purchased newspaper advertising from Newsday for publication in its newspaper. (Am. Compl. ¶¶ 8, 15.) The ads ran from September 1995 through July 30, 2004. (*Id.* ¶ 15.) Newsday is "the most widely circulated and read daily newspaper in Nassau and Suffolk Counties, the two counties which comprise that area of New York known as Long Island." (*Id.* ¶ 10.)

Plaintiffs allege that the rates they paid Newsday for advertising were based on artificially inflated circulation figures represented by Newsday and its distributors to an auditing company known as ABC. (*Id.* ¶ 18 at 6.)[1] Plaintiffs contend that, independently and through its distributors, Newsday falsified the circulation volumes it reported to ABC. (*See id.* ¶¶ 20, 21.) As a result, Plaintiffs claim to have paid at least ten percent more than they should have for advertising. (*Id.* ¶¶ 26-28.)

Staluppi owns and operates a number of automobile dealerships on Long Island

---

[1] There are two paragraphs in the Amended Complaint that are numbered "18." One appears on page six, the other on page seven.

that "are in direct competition" with those owned and operated by Plaintiffs. (*Id.* ¶ 11.) Staluppi was part of what the pleading refers to as the "Preferred Group," a group of large automotive dealers located in Long Island who became "disenchanted with Newsday's advertising prices and/or practices." (*Id.* ¶ 53.) Staluppi created a competing publication for the purpose of advertising automobiles for sale entitled "Price Finder." (*Id.* ¶ 54.) Newsday, recognizing the potential threat of such a publication to its "dominance of the Long Island automobile advertising market," sought to eliminate Price Finder. (*Id.* ¶ 55.) To effectuate this goal, Newsday allegedly entered into an agreement with the Preferred Group whereby Newsday provided the Group with discounted advertising rates in return for Staluppi's promise to cease publication of Price Finder. (*Id.* ¶ 56.) Pursuant to this agreement, Newsday specifically agreed "not to provide such deep discounts for advertising to Plaintiffs and any other dealer not a member of the Preferred Group for advertisements in Newsday." (*Id.* ¶ 57.) Upon information and belief, Plaintiffs allege that "dealers who are not members of the Preferred Group pay amounts in excess of eight times the amounts paid by members of the Preferred Group for advertisements placed in Newsday." (*Id.* ¶ 58.)

In addition to the foregoing, Plaintiffs charge Newsday with a variety of anti-competitive conduct, including the acquisition of publications that were actual or potential competitors, (*id.* ¶ 48), and refusing to accept advertisements from any merchant who advertised in a competing publication known as "Suffolk Life." (*Id.* ¶ 51.)

Plaintiffs allege that "Newsday is the only meaningful avenue by which automobile dealers including the Plaintiffs may advertise, in the print media or otherwise." (*Id.* ¶ 89.) In this regard, Plaintiffs claim that "[n]ewspaper advertising for automobile sales is the

single most, and in many cases the sole source, of advertising for car sales dealerships." (*Id.* ¶ 72.) As for the other area newspapers, Plaintiffs allege that "Long Island businesses will not generally seek advertising in the *New York Post, New York Times and/or New York Daily News*, as these publications are considered 'city papers' and cover too broad a geographic area to be a meaningful source of advertising for Long Island merchants." (*Id.* ¶ 67.)

Plaintiffs commenced this action on July 21, 2004. On August 12, 2004, Plaintiffs brought a motion for a temporary restraining order and preliminary injunction, seeking to prevent Newsday from not running Plaintiffs' advertisements as a result of this litigation. On September 1, 2004, the parties entered into a stipulation pursuant to which Plaintiffs would be permitted to advertise in Newsday during the pendency of this litigation.

Plaintiffs filed their Amended Complaint on August 23, 2006. The Amended Complaint asserts fifteen causes of action. Specifically, Plaintiffs bring claims under the Sherman Act for (1) unlawful conspiracy/restraint of trade; (2) conspiracy to monopolize; (3) attempt to monopolize; (4) monopolization; and (5) predatory pricing in the "Long Island Automobile Advertising Market," and (6) unlawful conspiracy/restraint of trade; (7) conspiracy to monopolize; and (8) attempt to monopolize the "Long Island New Automobile Sales Market." These claims, as well as Plaintiffs' state law antitrust claims brought pursuant to the Donnelly Act, are asserted against all Defendants. Plaintiffs also bring one claim for false advertising under the Lanham Act and state-law claims for fraud, unjust enrichment, negligent misrepresentation and breach of contract. This latter group of claims is asserted against Newsday and Tribune only. (*See* Pls.' Mem. in Opp'n to Staluppi's Mot. at 17.)

## DISCUSSION

### I. Standard of Review

The court may not dismiss a complaint under Rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *King v. Simpson,* 189 F.3d 284, 286 (2d Cir. 1999); *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir. 1996). The Court must accept all factual allegations in the proposed complaint as true and draw all reasonable inferences in favor of the plaintiff. *King*, 189 F.3d at 287; *Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997).

### II. All Antitrust Claims Against Tribune (Counts One through Ten) are Dismissed

Tribune argues that all claims against it should be dismissed because the Amended Complaint is devoid of any factual allegations that Tribune participated in or controlled Newsday's allegedly wrongful conduct. In response, Plaintiffs contend that Tribune "overlooks" Plaintiffs' allegations that Tribune, the parent company of its wholly-owned subsidiary Newsday, "has participated in the acts, practices, schemes and violations of law attributed to defendant Newsday, and has conspired with others in furtherance of the unlawful acts described below." (Am. Compl. ¶ 9.) Plaintiffs' contention is unavailing.

Plaintiffs' failure to articulate *any* specific allegations against Tribune is fatal to their claims. "As a general matter [and absent any allegations of piercing the corporate veil], a corporate relationship alone is not sufficient to bind a parent corporation for the actions of its subsidiary." *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 69 (2d Cir. 1996) (citation and internal quotation marks omitted). More specifically, in the antitrust context, courts have held that absent allegations of anticompetitive conduct by the parent, there is no basis for holding a

parent liable for the alleged antitrust violation of its subsidiary. *See Invamed, Inc. v. Barr Labs., Inc.*, 22 F. Supp.2d 210, 299 (S.D.N.Y. 1998) ("[T]hat the Affiliates possess market power through their alleged ownership interests in Brantford, standing alone, does not satisfy the pleading requirements of a monopolization or attempted monopolization claim."); *Gemco Latinoamerica, Inc. v. Seiko Time Corp.*, 685 F. Supp. 400, 403 (S.D.N.Y. 1988) ("Thus, in the absence of a basis for piercing the corporate veil, the parent or grandparent may be held liable only if shown to have acted independently to affect the market [at issue]."). Here, there are no allegations in the Amended Complaint that even suggest that Tribune was involved in Newsday's actions in any way. Accordingly, Plaintiffs' antitrust claims (counts one through ten) are dismissed as against Tribune.[2]

In their opposition papers, Plaintiffs assert that "discovery will demonstrate that Tribune employees directed and controlled the activities of Newsday employees and themselves engaged in overt acts in furtherance of the antitrust violations." (Pls.' Opp'n to Tribune's Mot. at 6.) This argument puts the cart before the horse and ignores the fact that discovery has to be tied to a pleading which passes muster under Rule 12(b)(6). As discussed *infra*, however, the Court grants Plaintiffs leave to amend so that they may cure any pleading defects consistent with this decision. Accordingly, to the extent any such amendment asserts antitrust claims against Tribune, the allegations shall be sufficiently particularized so as to delineate Tribune's role in any alleged anticompetitive conduct.

## III.    *Interstate Commerce*

Newsday asserts that all of Plaintiffs' antitrust claims should be dismissed for

---

[2] Plaintiffs' remaining claims against Tribune will be discussed *infra*.

failure to allege subject matter jurisdiction. To assert a claim under the Sherman Act, a plaintiff must establish jurisdiction by satisfying the Act's commerce requirement. *See* 15 U.S.C. §§ 1 and 2 (governing "commerce among the several States").[3] The "scope of antitrust jurisdiction is broad indeed and 'encompasses far more than restraints on trade that are motivated by a desire to limit interstate commerce or that have their sole impact on interstate commerce.'" *Hamilton Chapter*, 128 F.3d at 66 (quoting *Hospital Building Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 743 (1976)). "The commerce requirement of the Sherman Act may be satisfied in two distinct ways: (1) where the defendant's conduct directly interferes with the flow of goods in the stream of commerce (the 'in commerce test'); or (2) where the defendant's conduct has a substantial effect on interstate commerce (the 'effect on commerce' test)." *Id.* at 66-67 (quoting *McLain v. Real Estate Board of New Orleans, Inc.*, 444 U.S. 232, 242 (1980)). With regard to the latter standard, Plaintiffs are not required to demonstrate a "causal link between the unlawful conduct and interstate commerce." *Id.* at 67; *see also McLain*, 444 U.S. at 242-43 ("Petitioners need not make the more particularized showing of an effect on interstate commerce caused by the alleged conspiracy . . .or by those other aspects of respondents' activity that are alleged to be unlawful."). Rather, "the inquiry is whether the aspects of the defendant's business that are infected by the allegedly unlawful conduct can reasonably be expected, as a matter of practical economics, to have a not insubstantial effect on interstate commerce." *Id.* (citations omitted).

  Here, Plaintiffs rely on the following allegations in the Amended Complaint to

---

[3] Where, as here, a jurisdictional challenge is made to the pleading, "the analyses under Rule 12(b)(1) and Rule 12(b)(6) merge: the critical inquiry is into the adequacy of plaintiff's allegations that the challenged conduct affects interstate commerce." *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College*, 128 F.3d 59, 63 (2d Cir. 1997)

demonstrate jurisdiction:

> [Newsday and Tribune] (1) publish substantial quantities of state[,] national and international news, (2) pay substantial sums for such news and for material shipped to it from various parts of the United States and the rest of the world, (3) carry a substantial quantity of national advertising sent throughout the United States, (4) are involved in many transactions in interstate or foreign commerce regarding shipments and payments for the foregoing, and (5) place their product in an online format intended especially for individuals or groups located in states other than New York and countries other than the United States.

(Am Compl. ¶ 4.)  In addition, in their memorandum of law in opposition to Newsday's motion, Plaintiffs assert that to the extent the Court finds Plaintiffs' allegations lacking, they can easily cure any defect by amending their allegations to state that "the purchase of new automobiles by the automobile dealer parties . . . from manufacturers in Detroit, Michigan; Japan; Korea; Germany; France; Italy; and The United Kingdom, for resale from their Long Island automobile dealerships, is in interstate commerce."  (Pls.' Mem. in Opp'n to Newsday's Mot. at 9-10.)

Accepting Plaintiffs' allegations as true, the Court finds that they are sufficient to establish antitrust jurisdiction.  Although Defendants correctly point out that there are other allegations in the pleading that suggest that the effects of Defendants' conduct are felt on a purely local level, (*see* Am. Compl. ¶¶ 80-81 (noting that the geographical market is limited to Long Island as most car customers on Long Island typically do not travel outside Long Island to locate a new car dealer)), the jurisdictional allegations do suggest that there are "aspects of [Newsday's] business that are infected by the allegedly unlawful conduct," *Hamilton Chapter*, 128 F.3d at 667, i.e., its advertisements, that can reasonably be expected to effect interstate commerce in a substantial way.  (*See, e.g.*, *id.* ¶ 4 (alleging that Newsday carries a "substantial quantity of national advertising sent throughout the United States").)

Moreover, the facts Plaintiffs have articulated in support of a potential amendment lend further support to a finding that Defendants' activities implicate interstate commerce. *Cf. Lorain Journal Co. v. United States*, 342 U.S. 143, 150-52 (1955) (finding local newspaper's actions affected interstate commerce where paper disseminated significant amounts of news from out-of-state and advertised many goods manufactured out-of state); *Taxi Weekly, Inc. v. Metropolitan Taxicab Bd. of Trade, Inc.*, 539 F.2d 907, 910 (2d Cir. 1976) (because advertisers of local paper were "largely manufacturers of cars and automotive parts who produced at and delivered from plants outside of New York state, . . . [local paper] was an instrument of interstate commerce."). Although these facts are not pled in the Amended Complaint, because the Court is granting Plaintiffs leave to amend, any further amendment shall include these additional jurisdictional allegations.

In sum, the Court finds that Plaintiffs have adequately alleged antitrust jurisdiction under the Sherman Act but may amend their pleading to further particularize their jurisdictional claims.

## IV.     Standing

Newsday argues that Plaintiffs lack standing to assert antitrust claims relating to the "newspaper advertising sales market." In order to have standing to bring a private antitrust action, a plaintiff must allege both antitrust injury and antitrust standing. *See Balaklaw v. Lovell*, 14 F.3d 793, 798 n.9 (2d Cir. 1994). Antitrust injury signifies more than just a personal injury. *See id.* at 797. Rather, "'Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of

anticompetitive acts made possible by the violation.'" *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). This requirement "underscores the fundamental tenet that [t]he antitrust laws . . . were enacted for the protection of *competition*, not *competitors*." *Id.* (citations and internal quotation marks omitted); *see also Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993) ("Insisting on proof of harm to the whole market fulfills the broad purpose of the antitrust law that was enacted to ensure competition in general, not narrowly focused to protect individual competitors. Were the law construed otherwise, routine disputes between business competitors would be elevated to the status of an antitrust action, thereby trivializing the Act because of its too ready availability.").

Once a plaintiff has established an antitrust injury, he must then demonstrate that he is a "proper plaintiff," i.e., that based on factors such as the directness and identifiability of his injuries, the plaintiff will be "an efficient enforcer of the antitrust laws." *See Balaklaw*, 14 F.3d at 798 n.9. The Supreme Court has identified several factors to consider in determining whether a particular plaintiff has "antitrust standing." *Associated General Contractors of Ca., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 537-44 (1983). They include: (1) the causal connection between an antitrust violation and the alleged harm suffered by the plaintiff; (2) the nature of plaintiff's antitrust injury; (3) the directness or indirectness of the asserted injury; (4) the existence of an identifiable class of persons other than plaintiff who were more direct victims of the antitrust violation, and (5) the potential for duplicative recovery or complex apportionment of damages. *Id.* at 537-44; *see also Balaklaw*, 14 F.3d at 798 n.9.

Under these analyses, Plaintiffs have standing as they allege both that

Defendants' conduct violated the antitrust laws and that Plaintiffs were directly injured by that conduct when they purchased advertisements at artificially inflated prices. As to the first requirement, antitrust injury, Plaintiffs allege more than a personal injury; rather, they allege that Defendants' actions have had an actual adverse effect on competition as a whole in the relevant market, i.e., the newspaper advertising sales market. (*See, e.g.*, Am. Compl. ¶¶ 48-49 (alleging that Newsday acquired publications that were actual or potential competitors in the relevant market thereby reducing competition); *id.* ¶ 51 (alleging that Newsday refused to accept advertisements from any merchant who advertised in a competing publication known as "Suffolk Life"); *id.* ¶ 56 (alleging that Newsday's agreement with the Preferred Group resulted in termination of a competing publication Price Finder); *id.* ¶¶ 57-58 (detailing alleged agreement between Newsday and Preferred Group which resulted in artificially inflated prices for any advertiser not part of preferred Group).)

As to antitrust standing, Defendants argue that Plaintiffs are not proper plaintiffs because they do not allege that they were injured as a result of Newsday's alleged anti-competitive conduct. In this regard, Defendants assert that Plaintiffs have not alleged that they ever sought to advertise in the publications Newsday allegedly sought to injure/acquire. The flaw in this argument, however, is that regardless of this omission from the pleading, Plaintiffs still allege direct injury resulting from Defendants' actions in the form of being charged higher prices as a result of reduced competition for advertising. Accordingly, the Court finds that Plaintiffs have set forth sufficient facts to state antitrust standing. *See Twombley v. Bell Atl. Corp.*, 425 F.3d 99, 112 (2d Cir. 2005) (stating that pleading burden required to state antitrust claim is "relatively modest").

## V.       Plaintiffs' Allegations of Antitrust Conspiracy

All Defendants move to dismiss Plaintiffs' antitrust claims on the ground that Plaintiffs' conspiracy claims are implausible.  More specifically, Defendants argue that it would be contrary to the economic self-interest of Staluppi and the Preferred Group to conspire with Newsday to eliminate Newsday's competition in the sale of automotive advertising on Long Island, i.e., Price Finder, because Staluppi and the Preferred Group, as Long Island car dealers, are customers in that market and thus would stand to gain by increased competition therein.  As further explained by Staluppi:

> In essence, plaintiffs allege that [Staluppi] agreed to remove itself as a competitor of Newsday in the market for automobile advertising, in exchange for discounts to [Staluppi] as a customer in that market.  But it would make absolutely no sense for [Staluppi] to agree to such a plan, where the object of the purported conspiracy would be to give [Staluppi's] supplier, Newsday, monopoly power over the very market in which [Staluppi] would remain a customer.

(Staluppi's Mem. at 6.)

In analyzing the alleged antitrust conspiracy, the Court is cognizant of the Second Circuit's admonition against dismissing such claims at this early stage of the litigation:

> To survive a Rule 12(b)(6) motion to dismiss . . . [t]he factual predicate that is pleaded does need to include conspiracy among the realm of plausible possibilities . . . . But short of extremes of bare bones and implausibility, a complaint in an antitrust case need only contain the short and plain statement of the claim showing that the pleader is entitled to relief that Rule 8(a) requires.

*Twombley*, 425 F.3d at 111 (citations and internal quotation marks omitted).  Here, Defendants' argument that the Preferred Group has nothing to gain from the elimination of Newsday's competitors ignores one possible interpretation of the pleading which is that the alleged

conspiracy enables the Preferred Group to achieve a dangerous probability of acquiring

monopoly power in new automobile sales on Long Island.  Given Plaintiffs' allegation that

Newsday is the single most important source of advertising for car dealerships on Long Island,

(*see* Am. Compl. ¶¶ 66-67, 72), foregoing Price Finder may have been a small price to pay in

exchange for the benefits reaped via the deep discounts the Preferred Group allegedly received

on Newsday advertising.  Thus, contrary to Defendants' assertions, the Court finds that

Plaintiffs' conspiracy claims are not "wholly implausible" and therefore denies Defendants'

motion to dismiss this claim.  Of course, Defendants are free to move for summary judgment on

this claim after discovery.  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002)

("Furthermore, Rule 8(a) establishes a pleading standard without regard to whether a claim will

succeed on the merits.  Indeed it may appear on the face of the pleadings that a recovery is very

remote and unlikely but that is not the test.") (citation and internal quotation marks omitted).

**VI.     Plaintiffs' Predatory Pricing Claim**

Plaintiffs' fifth cause of action asserts a violation of section 2 of the Sherman Act

based upon alleged predatory pricing.  To state a claim of monopolization under section 2, a

plaintiff must demonstrate: "(1) the defendant had monopoly power in the relevant market;

(2) the defendant engaged in anticompetitive conduct; and (3) its injury was, in fact, caused by

the defendant's violation of the antitrust laws."  *Irvin Indus., Inc. v. Goodyear Aerospace Corp.*,

974 F2d 241, 244 (2d Cir. 1992) (citations and internal quotation marks omitted).  Predatory

pricing is one way a plaintiff may establish the second element.  *Id.*

"Predatory pricing may be defined as pricing below an appropriate measure of

cost for the purpose of eliminating competitors in the short run and reducing competition in the

long run." *Cargill, Inc. v. Montfort of Colorado, Inc.*, 479 U.S. 104, 117 (1986). Predatory

pricing occurs in three phases:

> First, a seller temporarily cuts his price with the intent of
> eliminating his competitors or deterring potential competitors from
> entering the market. Second, the damage to or discouragement of
> competitors enables the predator to create or maintain a monopoly.
> Third, the predator recoups revenues lost through the temporary
> price cut by charging higher, monopoly prices. When a predatory
> pricing allegation is advanced soon after the price cut, the issue is
> whether that price cut is part of a predatory pricing scheme. The
> price cut may simply reflect the seller's efficiency or efforts to
> break into a competitive market. Moreover, if the market structure
> renders recoupment of profits lost during the price cut phase
> difficult or risky, it may be unlikely that the seller's price cut is
> predatory.

*Irvin Indus.*, 974 F.2d at 244 (citations omitted). Thus, "a plaintiff seeking to establish

competitive injury resulting from a rival's low prices must prove that the prices complained of

are below an appropriate measure of its rival's costs" and "that the competitor had a . . .

dangerous probability[] of recouping its investment in below-cost prices." *Brooke Group Ltd. v.*

*Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222, 224 (1993). Furthermore, as noted by

the Supreme Court:

> [P]redatory pricing schemes are rarely tried, and even more rarely
> successful, and the costs of an erroneous finding of liability are
> high. The mechanism by which a firm engages in predatory
> pricing--lowering prices--is the same mechanism by which a firm
> stimulates competition; because cutting prices in order to increase
> business often is the very essence of competition . . . mistaken
> inferences . . . are especially costly, because they chill the very
> conduct the antitrust laws are designed to protect. It would be
> ironic indeed if the standards for predatory pricing liability were so
> low that antitrust suits themselves became a tool for keeping prices
> high.

*Id.* at 226-27 (citations and internal quotation marks omitted).

Here, all Defendants move for dismissal of this claim. As an initial matter, the Court finds that this claim cannot be sustained as against Staluppi as Plaintiffs do not, and cannot, allege that Staluppi is charging prices in the automobile advertising market below its costs or that Staluppi has a dangerous probability of recouping its investment in below-cost prices. Simply put, Staluppi is alleged to be a an owner and operator of car dealerships, not a supplier of automobile advertisements. In fact, the whole basis of Plaintiffs' purported anticompetitive conspiracy between Newsday and Staluppi is premised upon Staluppi no longer competing in the Long Island automobile advertising market. Although it is alleged that Staluppi published Price Finder at some unidentified time, it is further alleged that Price Finder "ceased to exist" pursuant to Staluppi's agreement with Newsday. (*Id.* ¶ 56.) Nowhere do Plaintiffs claim that while Staluppi was publishing Price Finder, it cut Price Finder's prices for the purpose of eliminating competition. Accordingly, Plaintiffs' claim of predatory pricing is dismissed as to Staluppi.

The analysis with respect to Newsday is not as simple. The Amended Complaint alleges that Newsday

> charged prices for certain dealers at levels less than Newsday's reasonably anticipated average marginal cost or its reasonably anticipated average variable cost of such advertising [with] the expectation that it would be able to recoup its lost profits for Newsday's predatory pricing by charging excessive fees for advertising to its other advertisers, including Plaintiffs, as a result of its dominant position in the relevant markets, including the Long Island automobile advertising market.

(Am. Compl. ¶¶ 131, 134.) In their opposition papers, Plaintiffs expound on this theory by asserting that "the reason why Newsday agreed to steeply discounted prices for automotive advertising exclusively for Staluppi and the Preferred Group, was to eliminate the threat to

Newsday's monopoly position as the 'sole source' of automotive advertising on Long Island, represented by Staluppi's introduction of 'Price Finder[]' as a direct mail medium of automotive advertising in competition with Newsday." (Pls.' Opp'n to Newsday's Mot. at 17 (citing Am. Compl. ¶¶ 53-59).)

Newsday argues, inter alia, that Plaintiffs' theory of predatory pricing does not fall within the ambit of that doctrine as it has been defined by the case law. As noted above, the essence of a predatory pricing scheme entails a seller temporarily lowering prices below costs, thereby driving out the competition or deterring potential competitors from entering the market, and enabling the seller to maintain monopoly power long enough to recoup losses through the subsequent charging of higher, monopoly prices. *See Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.8, 589 (1986). Here, although Plaintiffs have articulated a general allegation that Newsday priced its rates for advertising below cost, this discount was offered to members of the Preferred Group only. Other car dealerships, including Plaintiffs, were not only not offered this discount but allegedly paid "excessive" rates. (Am. Compl ¶ 64.) It is therefore unclear how this selective discount would enable Newsday to create or maintain a monopoly through below-cost prices as by Plaintiffs' own account, there remain a large group of dealers, including Plaintiffs, who are paying above-market rates. This fact alone would seem to undercut Plaintiffs' theory that Newsday's actions constitute predatory pricing.

Plaintiffs, however, allege more than just a price differential between them and the Preferred Group.[4] They also allege that this scheme enabled Newsday to maintain a

_____

[4] Price discrimination, charging different buyers different prices for the same products, is not a cognizable claim under the Sherman Act, *see State of N.Y. v. Mobil Oil Corp.*, 38 N.Y.2d 460, 463 (1976), and instead, may be brought under the Robinson-Patman Act. *See George*

monopoly by eliminating Price Finder and that any losses sustained by virtue of the low prices offered to the Preferred Group were recouped via the higher prices offered to Plaintiffs. *Cf. Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 n.9 (1990) ("This is not to deny that a vertical price-fixing scheme may facilitate predatory pricing. A supplier, for example, can reduce its prices to its own downstream dealers and share the losses with them, while forcing competing dealers to bear by themselves the full loss imposed by the lower prices.") (citing *FTC v. Sun Oil Co.*, 371 U.S. 505, 522 (1963)). Thus, to the extent a predatory pricing scheme requires Plaintiffs to allege that "the prices complained of are below an appropriate measure of [Newsday's] costs" and "that [Newsday] had a . . . dangerous probability[] of recouping its investment in below-cost prices," *Brooke Group Ltd.*, 509 U.S. at 222, 224, Plaintiffs have satisfied their burden. That being said, the Court recognizes that Plaintiffs' theory differs from the manner in which predatory pricing has chiefly been used in the case law, i.e, one competitor suing another for pricing below costs and driving the former out of the market. Moreover, given Plaintiffs' allegation that many dealers, including Plaintiffs, paid inflated rates, it is unclear whether this alleged scheme would result in any loss to Newsday. *See Matsushita*, 475 U.S. at 588 ("Any agreement to price below the competitive level requires the conspirators to forgo

---

*Haug Co. v. Rolls Royce Motors Cars, Inc.*, 148 F.3d 136, 140 (2d Cir. 1998) ("The [Robinson-Patman] Act requires that each purchaser be given an 'equal opportunity' by the seller to receive the benefit of higher or lower prices."). Here, Plaintiffs do not assert claims for price discrimination under the Robinson-Patman Act, presumably because the Act's prohibition on price discrimination extends only to transactions involving "commodities" which do not include newspaper advertising. *See Innomed Labs, LLC v. ALZA Corp.*, 368 F.3d 148, 156 (2d Cir. 2004) (citing *Ambook Enters. v. Time Inc.*, 612 F.2d 604, 609-10 (2d Cir. 1979)). Newsday argues that Plaintiffs' predatory pricing claim is really no more than a claim of price discrimination. But as discussed above, the Court finds that Plaintiffs' alleged scheme may constitute more than mere price discrimination.

profits that free competition would offer them. The forgone profits may be considered an investment in the future."); *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 55 (2d Cir. 1979) (finding no basis for finding of predatory acts absent evidence that challenged practice would "produce even a short-term loss for the [defendant's] operations taken as a whole"). Nonetheless, at this stage of the litigation, and based on the papers submitted, the Court declines to dismiss Plaintiffs' predatory pricing claim.

## VII.  *Plaintiffs' Claims Pertaining to the New Automobile Sales Market*

Plaintiffs' sixth, seventh, and eighth causes of action seek redress for alleged anticompetitive harm in the "new automobile sales market." Specifically, Plaintiffs contend that Defendants have: (1) conspired to restrain trade in this market in violation of section 1 of the Sherman Act (sixth cause of action); and (2) conspired to monopolize this market in violation of section two of the Sherman Act (seventh and eighth causes of action). The Court will address Plaintiffs' claims separately.

### A.  The Eighth Cause of Action

#### 1.  Claims Against Newsday

Working backwards, the Court finds that Plaintiffs' eighth cause of action for attempted monopolization of the new automobile sales market as against Newsday is clearly deficient. To state such a claim, Plaintiffs must allege: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *see also Twombley*, 506 U.S. at 456. "In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the

18

relevant market and the defendant's ability to lessen or destroy competition in that market." *Id.*
In this regard, the Second Circuit has held that "it is axiomatic that a firm cannot monopolize a
market in which it does not compete." *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1062 (2d
Cir. 1996), *vacated on other grounds*, *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998).

Here, according to the Amended Complaint, Plaintiffs and Staluppi sell cars on
Long Island. (Am. Compl ¶¶ 8, 11.) Newsday, on the other hand, publishes a newspaper and
sells advertising space in that newspaper. (*Id.* ¶¶ 10, 12, 15.) There is no allegation in the
Amended Complaint that Newsday has any presence whatsoever in the Long Island automobile
sales market, much less any allegation that Newsday possesses market power in that market.
Although there are allegations that Newsday conspired with the Preferred Group to monopolize
the new automobile sales market, these allegations are insufficient to state a claim for
monopolization or attempted monopolization. Although "[a] defendant may be liable for
conspiracy to monopolize where it agrees with another [company] to assist that [company] in its
attempt to monopolize the relevant market," *see Discon*, 93 F.3d 1062, a defendant may only be
held liable for monopolization or attempted monopolization if the *defendant itself* competed
directly in that market. *Id.*; *see also Tops Markets, Inc. v. Quality Markets, Inc.*, No. 93-CV-
0302E, 2000 WL 1160466, at *11 (W.D.N.Y. Aug. 10, 2000) ("The end result of an attempted
monopolization – as contrasted with a conspiracy to monopolize [] – is not simply that the
relevant market be monopolized but that the defendant be the monopolizer.") (citing *Discon*, 93
F.2d at 1062). Accordingly, because there are no allegations that Newsday competes in the new
automobile sales market, Plaintiffs' eighth cause of action, for attempted monopolization of this
market, is dismissed as to Newsday.

19

### 2. *Claims Against Staluppi*

The eighth cause of action alleges that Staluppi attempted to monopolize the new automobile sales market.  As noted above, one of the elements of such a claim is that the defendant has a "a dangerous probability of achieving monopoly power." *Spectrum Sports,* 506 U.S. at 456.  The Second Circuit has repeatedly noted that "[a] threshold showing for a successful attempted monopolization claim is sufficient market share by the defendant because a defendant's market share is the primary indicator of the existence of a dangerous probability of success." *AD/SAT, a Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 226 (2d Cir. 1999) (citations and internal quotation marks omitted); *see generally Commercial Data Servers, Inc. v. IBM Corp.*, 262 F. Supp. 2d 50, 74 (S.D.N.Y. 2003) ("Courts have consistently held that firms with market shares of less than 30% are presumptively incapable of exercising market power.") (citations and internal quotation marks omitted).

Here, Plaintiffs allege that Staluppi owns and operates a number of car dealerships on Long Island, including fifteen specifically identified dealerships.  (Am. Compl. ¶ 11.)  Plaintiffs further allege that "Defendants . . . control such a substantial share of the relevant [market]," (*id.* ¶ 159), and that the Preferred Group, which includes Staluppi, "dominates the consumer market for new car sales on Long Island." (*Id.* ¶ 93.)  Although these allegations do not specify Staluppi's exact share of the alleged Long Island market for new automobile sales, the Court finds they easily pass muster under Rule 12(b)(6).  As noted by Plaintiffs, Staluppi's exact market share is an issue that can be further developed in discovery.  Accordingly, Staluppi's motion to dismiss the eighth cause of action on this basis is denied.

### B.     The Sixth and Seventh Causes of Action

Newsday does not move to dismiss Plaintiffs' sixth or seventh causes of action on the ground that it does not compete in the new automobile sales market, presumably because these claims involve allegations of conspiracy and Newsday, although not in the new automobile market, may nonetheless be held liable for conspiracies related thereto.  (*See* Newsday's Reply at 8 n.7.)  Instead, Newsday moves to dismiss these claims based upon Plaintiffs' failure to adequately define this market.

As a prerequisite to any antitrust claim, Plaintiffs must allege a relevant product market which Defendants' antitrust activities are alleged to have affected.  *See Marchon Eyewear, Inc. v. Tura LP*, No. 98 CV 1932, 2002 WL 31253199, at *5 (E.D.N.Y. Sept. 30, 2002); *Smith & Johnson, Inc. v. Hedaya Home Fashions Inc.*, No. 96 Civ. 5821, 1996 WL 737194, at *5 (S.D.N.Y. Dec. 26, 1996) "Without a definition of the relevant product market, there is no way to measure a company's ability to act as a monopolist." *United States v. Eastman Kodak Co.*, 63 F.3d 95, 104 (2d Cir 1995).  "Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001).  "There is, however, no absolute rule against the dismissal of antitrust claims for failure to allege a relevant product market." *Id.* at 200.

Here, the Amended Complaint lists "new automobile sales" as a relevant market, (Am. Compl. ¶ 65(c)), but fails to offer *any* allegations describing this market.  In their opposition papers, Plaintiffs do not deny the absence of any specific allegations but instead argue that Newsday's demand that Plaintiffs comply with "technical pleading requirements" is no more

than an attempt by Defendants to "elevate [such requirements] above substance, common sense and legal precedent." (Pls.' Mem. in Opp'n to Newsday's Mot. at 18.) The Court disagrees.

"To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes--analysis of the interchangeability of use or the cross-elasticity of demand[5], and it must be plausible." *Todd*, 275 F.3d at 200 (citations and internal quotation marks omitted). Here, the pleading is devoid of any factual allegations which suggest that these prerequisites have been met. Especially glaring is the absence of any allegations as to why Plaintiffs' market should be limited to "new automobiles." *See Todd*, 275 F.3d at 200 (noting that dismissal is appropriate when complaint fails to "even . . . attempt a plausible explanation as to why a market should be limited in a particular way").

Furthermore, Plaintiffs' suggestion that they are relieved of the obligation to include market definition allegations in the Amended Complaint because other courts have found new automobile sales to be a relevant market is clearly misguided. The issue is not whether new automobile sales can ever be recognized as a valid market; rather, the issue is whether under the present facts, Plaintiffs have properly pled this to be the case.

In sum, because Plaintiffs make no effort to define the "new automobile sales" market they name in their Amended Complaint, their sixth and seventh causes of action are dismissed. However, because there is nothing to suggest that if properly pled, Plaintiffs could not state viable claims, as discussed *infra*, the Court grants Plaintiffs leave to amend so that

---

[5] Cross-elasticity of demand refers to "the extent to which consumers will change their consumption of one product in response to a price change in another." *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 469 (1992).

Plaintiffs may cure these pleading defects.

## VIII.    *Plaintiffs' Claims Pertaining to the Long Island Automotive Advertising Market*

Staluppi moves to dismiss Plaintiffs' third and fourth causes of action for attempt to monopolize and monopolization with regard to the Long Island automotive advertising market.  To state a claim for monopolization, Plaintiffs must allege, inter alia, that Defendants possess monopoly power in a relevant market.  *See United States v. Grinnell Corp.*, 384 U.S. 563, 570 (1966).  Furthermore, as noted above, to state a claim for attempted monopolization, Plaintiffs must allege, inter alia, that Defendants have a "dangerous probability of achieving monopoly power."  *Spectrum Sports*, 506 U.S. at 456.

Here, Plaintiffs claim that as a result of the purported agreement between Staluppi and Newsday, Staluppi's "competing publication Price Finder ceased to exist."  (Am. Compl. ¶ 56.)  Therefore, Plaintiffs themselves allege that Staluppi does not compete in the relevant market and, accordingly, Staluppi's motion to dismiss counts three and four is granted.

## IX.    *Plaintiffs' Claims Under the Donnelly Act*

Plaintiffs' ninth and tenth causes of action assert claims under New York's antitrust statute, the Donnelly Act, N.Y. General Business Law §§ 340 et seq.  Defendants move to dismiss these claims on the ground that they "track" Plaintiffs' federal antitrust claims and should be dismissed if the latter claims are dismissed.  Because the Court has not dismissed Plaintiffs' claims under the Sherman Act in their entirety, Defendants' motion to dismiss Plaintiffs' claims under the Donnelly Act is denied.

## X.    *Plaintiffs' Claims Under the Lanham Act*

Plaintiffs' eleventh cause of action asserts a claim against defendants Newsday

and Tribune under section 43 of the Lanham Act, 15 U.S.C. § 1125, based upon defendants' alleged "materially false and misleading statements of fact in advertising their circulation volumes to purchasers of their new car automotive print advertising, including the Plaintiffs" (Am. Compl. ¶ 188.) "[T]o have standing for a [Lanham Act] false advertising claim, the plaintiff must be a competitor of the defendant and allege a competitive injury." *Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 1997 (2d Cir. 2001) (citations and internal quotation marks omitted). Here, Plaintiffs do not compete with Newsday or Tribune. Rather, they are merely consumers. Accordingly, Plaintiffs' Lanham Act claims are dismissed. *See Hassan v. Spicer*, No. O5-CV-1526, 2006 WL 228958, at *5 (E.D.N.Y. Jan. 31, 2006) (dismissing Lanham Act claim where plaintiff and defendant not competitors); *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 659 (S.D.N.Y. 1996) (consumer standing would transform "the federal court system into a veritable small claims court.") (citations and internal quotation marks omitted), *aff'd*, 113 F.3d 1229 (2d Cir. 1997).

## XI.    *Plaintiffs' State Law Claims*

As noted above, Plaintiffs' state law claims are asserted against Newsday and Tribune only. The Court will discuss them in turn.[6]

### A.    *Fraud*

The twelfth cause of action asserts a claim of fraud based upon Newsday's and Tribune's alleged false representations regarding Newsday's circulation figures. Plaintiffs allege that they justifiably relied on these misrepresentations to their detriment and "paid more for

---

[6] Defendants do not move to dismiss the thirteenth cause of action for unjust enrichment. Accordingly, the Court will not address this claim.

placing ads in Newsday than they would have if the true and accurate circulation volumes had been reported to ABC and to the general public."  (Am. Compl. ¶ 199; *see also id.* ¶¶ 195-204.)

Defendants argue that Plaintiffs fail to state a claim for fraud because the alleged misrepresentations were not made by Tribune or Newsday *to* Plaintiffs; rather they were made to an independent auditing company known as ABC.  (*See* Am. Compl. ¶ 18, at 6 ("[T]he rates charged by Newsday for its automotive print advertising were based on the circulation volume represented by Newsday and its distributors to . . . ABC.").)  Defendants contend that a claim for fraud cannot be premised upon statements made to a third party.  Defendants are mistaken.

Preliminarily, the Court notes that it is unclear from the pleading which entity actually relayed the alleged false representations regarding Newsday's circulation figures to the general public, including Plaintiffs.  (*See id.* ¶¶ 196-98 (suggesting Newsday and Tribune made the misrepresentations).)  Moreover, in opposition to the instant motions, Plaintiffs submit copies of Tribune's Annual Reports for the years 2000 through 2003 and ask the Court to take judicial notice of the fact that these filings contain the artificially inflated circulation figures, which according to Plaintiffs, helped "further[] the overcirculation fraud."  (Pls.' Mem. in Opp'n Tribune's Mot. at 6.)  Although it is more likely that Plaintiffs obtained this information from ABC rather than from Tribune's Annual Reports, it is possible that Plaintiffs learned of these figures therefrom.  Thus, the Annual Reports undermine Tribune's argument that the representations were not made directly from Tribune to Plaintiffs.

More importantly, however, and contrary to Defendants' assertions, New York law does permit recovery for misrepresentations made to third parties under limited circumstances.  *See Securities Inv. Protection Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 76-77

(2d Cir. 2000) ("[T]o recover in New York for misrepresentations made to a third party, the plaintiff must establish that he or she relied to his or her detriment on the misrepresentations and that the defendant intended those misrepresentations to be communicated to the plaintiff.").  As noted by the Second Circuit:

> Analyzing the reliance element in third-party fraud cases, several decisions have suggested that a plaintiff may demonstrate reliance where the third party does not directly repeat the defendant's misrepresentations to the plaintiff, but rather communicates them in a repackaged or summary form, on which the plaintiff then relied.  In *Tindle v. Birkett*, 171 N.Y. 520, 64 N.E. 210 (1902) for example, the New York Court of Appeals permitted recovery for misrepresentations made by the defendants to a credit rating agency for purposes of receiving a favorable rating. The plaintiffs never received those misrepresentations directly, but rather relied on the favorable credit rating the agency had formulated using the defendants' misinformation. *See id.* at 522-23, 64 N.E. 210. The Court of Appeals found that because the plaintiffs extended credit to the defendants "in reliance on the correctness of the rating, without any other knowledge [of the defendant's financial situation]," they had established the reliance necessary to sustain a fraud claim against the defendant.  *Id.* at 523, 64 N.E. 210.

*Id.* at 77.  Here, to the extent Plaintiffs allege that Newsday reported false circulation figures to ABC, which in turn relayed these misrepresentations to Plaintiffs in anticipation of their reliance, these allegations would clearly fall within the ambit of third-party liability as enunciated above.  Accordingly, Tribune's and Newsday's motion to dismiss the fraud count is denied.

**B.      Negligence Misrepresentation**

Plaintiffs' fourteenth cause of action asserts a claim for negligent misrepresentation based upon the same set of facts upon which Plaintiffs' fraud claim is grounded.  To recover for negligent misrepresentation under New York law, a plaintiff must satisfy the following elements:

> (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

*Hydro Invs., Inc. v. Trafalgar Power, Inc.,* 227 F.3d 8, 20 (2d Cir. 2000) (citations omitted).

Defendants argue that Plaintiffs' claim must fail because they have not alleged facts which would create a special relationship among the parties so as to give rise to a duty of care. "A duty of care may arise when there is actual privity of contract between the parties or a relationship so close as to approach that of privity, or if the defendant has fiduciary obligations to the plaintiff." *Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 584 (2d Cir. 2005) (citations and internal quotation marks omitted).

> A relationship is considered "so close as to approach that of privity" when the following criteria are met: 1) the defendant makes a statement with the awareness that the statement was to be used for a particular purpose; 2) a known party or parties rely on this statement in furtherance of that purpose; and 3) there is some conduct by the defendant linking it to the party or parties and evincing defendant's understanding of their reliance.

*Id.* (citing *Ossining Union Free School Dist. v. Anderson LaRocca Anderson*, 73 N.Y.2d 417, 425 (1989) and *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536 (1985), *order amended on other grounds*, 66 N.Y.2d 812 (1985)); *see also Prudential Ins. Co. of Am. v. Dewey, Ballantine, Bushby, Palmer & Wood*, 80 N.Y.2d 377, 382 (1992) (same).

"In New York, 'not all representations made by a seller of goods . . . will give rise to a duty to speak with care.'" *Dallas Aerospoce, Inc. v. CIS Air Corp.*, 352 F.3d 775, 788 (2d Cir. 2003) (quoting *Kimmell v. Schaefer*, 89 N.Y.2d 257 (1996)). "Instead, the law of negligent

misrepresentation requires a closer degree of trust between the parties than that of the ordinary buyer and seller in order to find reliance on such statements justified." *Id.*

Here, the Court finds that Plaintiffs have sufficiently alleged a relationship of privity or of that approaching privity between Plaintiffs and Newsday. As an initial matter, the Amended Complaint alleges that "several of the Plaintiffs had entered into advertising contracts with Newsday prior to the commencement of this lawsuit." (Am. Compl. ¶ 31a.) Thus, these Plaintiffs were clearly in privity with Newsday. As for the other Plaintiffs, the Amended Complaint alleges that they purchased automobile advertising from Newsday as well, but not directly; instead, they purchased advertising through agencies authorized to sell on behalf of Newsday. (*Id.* ¶ 15.) Nonetheless, due to their purchases of Newsday advertising, Plaintiffs have alleged sufficient "conduct by [Newsday] linking it to [these Plaintiffs]" such that Newsday should have been aware that they intended to rely on Newsday's statements for the purpose of purchasing advertising. *Aetna Cas.*, 404 F.3d at 584; *cf. id.* ("In contrast, where the statement at issue is directed at a 'faceless of unresolved class or persons,' no duty of care arises.") (quoting *White v. Guarente*, 43 N.Y.2d 356 (1977)). Accordingly, Newsday's motion to dismiss this claim is denied.

As to Tribune, however, the pleading is not so clear. The allegations under the "FOURTEENTH CAUSE OF ACTION NEGLIGENT MISREPRESENTATION" offer no specifics as to Tribune's involvement. Moreover, the body of the Amended Complaint refers to "several" Plaintiffs contracting with "Newsday" and makes no reference to Tribune. However, Plaintiffs do assert a breach of contract claim, discussed *infra*, which alleges that "Defendants Tribune and Newsday and Plaintiffs entered into Classified Advertising Contracts for the purpose

of Plaintiffs' advertising in Newsday." (Am. Compl. ¶ 218.) Accepting this allegation as true, Plaintiffs would be in privity of contract with Tribune and the negligent misrepresentation claim could be sustained on that basis. Accordingly, Tribune's motion to dismiss this claim is denied. Plaintiffs, however, are directed to flesh out their allegations as to Tribune's relationship with Plaintiffs in their second amended complaint.

## C. *Breach of Contract*

Plaintiffs' fifteenth cause of action is for breach of contract as against Tribune and Newsday. As noted above, the Amended Complaint alleges that Tribune, Newsday and Plaintiffs entered into contracts pursuant to which Plaintiffs would place advertisements in Newsday. (Am. Compl. ¶¶ 218.) It further alleges that "nine days after the filing of the instant action [July 21, 2004] . . . Defendants refused to accept and have not accepted Plaintiffs' advertising for Newsday" and thus have breached their contracts with Plaintiffs.[7] (*Id.* ¶ 219.)

Plaintiffs do not attach copies of the relevant contracts to the pleading. Nor do they submit copies in their opposition papers. Defendants Newsday and Tribune, however, submit a copy of "Newsday's standard classified advertising contract for 2003" with their moving papers. (Decl. of Andrea Rothchild, dated Dec. 2, 2004, ¶ 3.) Section 8(d) provides that Newsday "shall have the right to terminate this Agreement for any reason and at any time by written notice to Advertiser." (*Id.*) Thus, defendants argue, Plaintiffs' claim is belied by the terms of the actual advertising agreements they have signed.

In response, Plaintiffs argue that "[t]he contractual right to reject advertising

---

[7] As noted above, the parties entered into a stipulation on September 1, 2004, pursuant to which Plaintiffs would be permitted to advertise in Newsday during the pendency of this litigation.

relates to rejection of inappropriate content, not the unilateral right to disavow mutually binding contracts in retaliation for commencement of a lawsuit." (Pls.' Opp'n to Newsday's Mot. at 24.) They do not address section 8(d).

Although a court in deciding a Rule 12(b)(6) motion is generally limited to considering the facts alleged in the complaint, a district court may also consider documents that are attached to, incorporated by reference in, or integral to the complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002). Courts apply this exception where, as here, a plaintiff sues primarily on the basis of a document, such as a contract, and only attaches selected portions of that document, or fails to attach the document at all. *See International Audiotext Network, Inc. v. America Te. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir. 1995); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) ("In addition, we have held that when a plaintiff chooses not to attach to the complaint or incorporate by reference a prospectus upon which it solely relies and which is integral to the complaint, the defendant may produce the prospectus when attacking the complaint for its failure to state a claim, because plaintiff should not so easily be allowed to escape the consequences of its own failure.") (citing *I. Meyer Pincus and Assocs., P.C. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir. 1991)).

On its face, section 8(d) clearly states that Newsday may terminate the contract at any time. Moreover, there is a separate provision in the contract that provides that "[s]ubmission of an advertisement to [Newsday] does not constitute a commitment by [Newsday] to publish the advertisement. . . . Newsday has the right, in its sole and absolute discretion, to reject any advertisement or any portion thereof." (¶ 1(a).) Contrary to Plaintiffs' assertions, there is nothing in the contract that restricts Newsday's right to refuse to publish any advertisements submitted by

Plaintiffs to inappropriate content only. That being said, the Court has some reservations about universally applying this contract to dismiss all of Plaintiffs' breach of contract claims when there is no indication as to which Plaintiffs actually signed this agreement. In this vein, Newsday claims that this agreement was its standard advertising contract for 2003; Plaintiffs' ads ran from September 1995 through July 2004. (Am. Compl. ¶ 15.) Plaintiffs, however, at no point suggest that the agreement proffered by Newsday is not applicable to *all* of their claims. Accordingly, the Court grants defendants' motion to dismiss this claim but grants Plaintiffs leave to amend to the extent there are any plaintiffs whose contractual claims were not governed by the 2003 standard contract.

## XII. *Leave to Amend*

Plaintiffs argue that because "the Amended Complaint is the first pleading in this action that has been subject to a motion to dismiss, should the Court find any deficiencies in the Amended Complaint, Plaintiffs request the opportunity to cure any such deficiencies through a further amended pleading." (Pls.' Opp'n to Newsday's Mot. at 24.) The Court agrees.

Rule 15(a) of the Federal Rules of Civil Procedure provides in pertinent part that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). A motion to amend should be denied, however, "if there is an 'apparent or declared reason -- such as undue delay, bad faith or dilatory motive . . . , repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, [or] futility of amendment.'" *Dluhos v. Floating and Abandoned Vessel, Known as "New York"*, 162 F.3d 63, 69 (2d Cir. 1998) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

In determining whether proposed claims are futile, the Court is required to adopt

the same analysis as that applied on a motion to dismiss pursuant to Rule 12(b)(6). *Aetna Cas. and Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 604 (2d Cir. 2005). Here, with regard to several of Plaintiffs' claims that the Court has dismissed, Plaintiffs have proffered facts that if properly pled, would support viable causes of action. For example, Plaintiffs' failure to define the "new automobile sales market" can be easily cured via amendment. *See Valley Disposal, Inc. v. Central Vt. Solid Waste Mgmt. Dist.*, 31 F.3d 89, 97 (2d Cir. 1994) ("[W]e are loath to sustain the dismissal with prejudice of the two counts where the record so obviously reflects the means to remedy the pleading deficiency."); *Oliver Schools, Inc. v. Foley*, 930 F.2d 248, 253 (2d Cir. 1991) ("Where the possibility exists that the defect can be cured and there is no prejudice to the defendant, leave to amend at least once should normally be granted as a matter of course."). With regard to other claims, however, such as Plaintiffs' monopolization and attempted monopolization claims against Defendants in markets in which they clearly do not compete, the Court cannot conceive of any possible permutation on the facts as pled that might support an amendment. Accordingly, although the Court grants Plaintiffs' application for leave to amend, Plaintiffs are directed to do so consistent with the Court's decision. In addition, Plaintiffs are warned that failure to address the pleading concerns enunciated in this Order may result in dismissal with prejudice.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss the Complaint are GRANTED in part and DENIED in part. As to Tribune, the Court dismisses counts one through ten (federal and state antitrust claims), count eleven (Lanham Act claim), and count fifteen (breach of contract). As to Newsday, the Court dismisses counts six (violation of section 1 of the

Sherman Act eight with regard to the Long Island new automobile sales market), seven (conspiracy to monopolize the Long Island new automobile sales market), eight (attempt to monopolize the Long Island new automobile sales market), count eleven (Lanham Act claim), and count fifteen (breach of contract).  Finally, as to Staluppi, the Court dismisses counts three (attempt to monopolize the Long Island automotive advertising market), four (monopolization of the Long Island automotive advertising market ), six (violation of section 1 of the Sherman Act eight with regard to the Long Island new automobile sales market), seven (conspiracy to monopolize the Long Island new automobile sales market), eight (attempt to monopolize the Long Island new automobile sales market)[8] and eleven (Lanham Act claim).  Plaintiffs shall serve and file their Second Amended Complaint within thirty days of the date of this Order.

**SO ORDERED**

Dated: Central Islip, NY
        March 2, 2006


/s_____
Denis R. Hurley,
United States District Judge

---

[8]  Although Staluppi did not move to dismiss counts six through eight on the basis that Plaintiffs failed to adequately define the Long Island new automobile sales market, given the Court's finding in this regard, these counts are dismissed in their entirety and Plaintiffs are granted leave to amend.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

ARNOLD CHEVROLET LLC, et al.,                    **MEMORANDUM OF DECISION
                                                  AND ORDER**
                          Plaintiffs,             04-CV-3097 (DRH)(WDW)

        -v.-

TRIBUNE COMPANY, NEWSDAY, INC.,
and STALUPPI HOLDING COMPANY, INC.,

                          Defendants.
_____

**Appearances:**

**For the Plaintiff:**
**Bellavia Gentile & Associates, LLP**
200 Old Country Road
Mineola, New York 11501
By: Leonard A. Bellavia, Esq.

**Law Offices of Mitchell C. Shapiro**
15 Cutter Mill Road, Suite 207
Great Neck, New York 11021
By: Mitchell C. Shapiro, Esq.

**For the Defendants Tribune Company and Newsday, Inc.:**
**Sidley Austin Brown & Wood LLP**
787 Seventh Avenue
New York, New York 10019
By: Robert W. Hirth, Esq.
    Alan M. Ungar, Esq.

**For the Defendant Staluppi Holding Company, Inc.:**
**Ruskin Moscou Faltischek, P.C.**
190 EAB Plaza
East Tower, 15th Floor
Uniondale, New York 11556-0190
By: Mark S. Mulholland, Esq.
    Jesse L. Sands, Esq.

**HURLEY, District Judge:**

            Plaintiffs Arnold Chevrolet LLC, et al. ("Plaintiffs") filed the instant action

alleging that defendants Tribune Company ("Tribune"), Newsday, Inc. ("Newsday"), and

Staluppi Holding Company, Inc. ("Staluppi") (collectively, "Defendants") engaged in a

conspiracy, inter alia, to charge Plaintiffs higher prices for newspaper advertising than Plaintiffs'

competitors. Defendants move to dismiss the Complaint pursuant to Federal Rule of Civil

Procedure ("Rule") 12(b)(6). For the reasons that follow, Defendants' motions are granted in

part and denied in part.

## BACKGROUND

The following facts are drawn from the Amended Complaint. Plaintiffs are

owners and operators of automobile dealerships on Long Island who purchased newspaper

advertising from Newsday for publication in its newspaper. (Am. Compl. ¶¶ 8, 15.) The ads ran

from September 1995 through July 30, 2004. (*Id.* ¶ 15.) Newsday is "the most widely circulated

and read daily newspaper in Nassau and Suffolk Counties, the two counties which comprise that

area of New York known as Long Island." (*Id.* ¶ 10.)

Plaintiffs allege that the rates they paid Newsday for advertising were based on

artificially inflated circulation figures represented by Newsday and its distributors to an auditing

company known as ABC. (*Id.* ¶ 18 at 6.)[1] Plaintiffs contend that, independently and through its

distributors, Newsday falsified the circulation volumes it reported to ABC. (*See id.* ¶¶ 20, 21.)

As a result, Plaintiffs claim to have paid at least ten percent more than they should have for

advertising. (*Id.* ¶¶ 26-28.)

Staluppi owns and operates a number of automobile dealerships on Long Island

---

[1] There are two paragraphs in the Amended Complaint that are numbered "18." One
appears on page six, the other on page seven.

that "are in direct competition" with those owned and operated by Plaintiffs.  (*Id.* ¶ 11.)  Staluppi was part of what the pleading refers to as the "Preferred Group," a group of large automotive dealers located in Long Island who became "disenchanted with Newsday's advertising prices and/or practices."  (*Id.* ¶ 53.)  Staluppi created a competing publication for the purpose of advertising automobiles for sale entitled "Price Finder."  (*Id.* ¶ 54.)  Newsday, recognizing the potential threat of such a publication to its "dominance of the Long Island automobile advertising market," sought to eliminate Price Finder.  (*Id.* ¶ 55.)  To effectuate this goal, Newsday allegedly entered into an agreement with the Preferred Group whereby Newsday provided the Group with discounted advertising rates in return for Staluppi's promise to cease publication of Price Finder.  (*Id.* ¶ 56.)  Pursuant to this agreement, Newsday specifically agreed "not to provide such deep discounts for advertising to Plaintiffs and any other dealer not a member of the Preferred Group for advertisements in Newsday."  (*Id.* ¶ 57.)  Upon information and belief, Plaintiffs allege that "dealers who are not members of the Preferred Group pay amounts in excess of eight times the amounts paid by members of the Preferred Group for advertisements placed in Newsday."  (*Id.* ¶ 58.)

In addition to the foregoing, Plaintiffs charge Newsday with a variety of anti-competitive conduct, including the acquisition of publications that were actual or potential competitors, (*id.* ¶ 48), and refusing to accept advertisements from any merchant who advertised in a competing publication known as "Suffolk Life."  (*Id.* ¶ 51.)

Plaintiffs allege that "Newsday is the only meaningful avenue by which automobile dealers including the Plaintiffs may advertise, in the print media or otherwise."  (*Id.* ¶ 89.)  In this regard, Plaintiffs claim that "[n]ewspaper advertising for automobile sales is the

single most, and in many cases the sole source, of advertising for car sales dealerships." (*Id.* ¶ 72.) As for the other area newspapers, Plaintiffs allege that "Long Island businesses will not generally seek advertising in the *New York Post, New York Times and/or New York Daily News*, as these publications are considered 'city papers' and cover too broad a geographic area to be a meaningful source of advertising for Long Island merchants." (*Id.* ¶ 67.)

Plaintiffs commenced this action on July 21, 2004. On August 12, 2004, Plaintiffs brought a motion for a temporary restraining order and preliminary injunction, seeking to prevent Newsday from not running Plaintiffs' advertisements as a result of this litigation. On September 1, 2004, the parties entered into a stipulation pursuant to which Plaintiffs would be permitted to advertise in Newsday during the pendency of this litigation.

Plaintiffs filed their Amended Complaint on August 23, 2006. The Amended Complaint asserts fifteen causes of action. Specifically, Plaintiffs bring claims under the Sherman Act for (1) unlawful conspiracy/restraint of trade; (2) conspiracy to monopolize; (3) attempt to monopolize; (4) monopolization; and (5) predatory pricing in the "Long Island Automobile Advertising Market," and (6) unlawful conspiracy/restraint of trade; (7) conspiracy to monopolize; and (8) attempt to monopolize the "Long Island New Automobile Sales Market." These claims, as well as Plaintiffs' state law antitrust claims brought pursuant to the Donnelly Act, are asserted against all Defendants. Plaintiffs also bring one claim for false advertising under the Lanham Act and state-law claims for fraud, unjust enrichment, negligent misrepresentation and breach of contract. This latter group of claims is asserted against Newsday and Tribune only. (*See* Pls.' Mem. in Opp'n to Staluppi's Mot. at 17.)

## DISCUSSION

### I.     Standard of Review

The court may not dismiss a complaint under Rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  *King v. Simpson,* 189 F.3d 284, 286 (2d Cir. 1999); *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir. 1996).  The Court must accept all factual allegations in the proposed complaint as true and draw all reasonable inferences in favor of the plaintiff.  *King*, 189 F.3d at 287; *Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997).

### II.     All Antitrust Claims Against Tribune (Counts One through Ten) are Dismissed

Tribune argues that all claims against it should be dismissed because the Amended Complaint is devoid of any factual allegations that Tribune participated in or controlled Newsday's allegedly wrongful conduct.  In response, Plaintiffs contend that Tribune "overlooks" Plaintiffs' allegations that Tribune, the parent company of its wholly-owned subsidiary Newsday, "has participated in the acts, practices, schemes and violations of law attributed to defendant Newsday, and has conspired with others in furtherance of the unlawful acts described below."  (Am. Compl. ¶ 9.)  Plaintiffs' contention is unavailing.

Plaintiffs' failure to articulate *any* specific allegations against Tribune is fatal to their claims. "As a general matter [and absent any allegations of piercing the corporate veil], a corporate relationship alone is not sufficient to bind a parent corporation for the actions of its subsidiary."  *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 69 (2d Cir. 1996) (citation and internal quotation marks omitted).  More specifically, in the antitrust context, courts have held that absent allegations of anticompetitive conduct by the parent, there is no basis for holding a

parent liable for the alleged antitrust violation of its subsidiary.  *See Invamed, Inc. v. Barr Labs., Inc.*, 22 F. Supp.2d 210, 299 (S.D.N.Y. 1998) ("[T]hat the Affiliates possess market power through their alleged ownership interests in Brantford, standing alone, does not satisfy the pleading requirements of a monopolization or attempted monopolization claim."); *Gemco Latinoamerica, Inc. v. Seiko Time Corp.*, 685 F. Supp. 400, 403 (S.D.N.Y. 1988) ("Thus, in the absence of a basis for piercing the corporate veil, the parent or grandparent may be held liable only if shown to have acted independently to affect the market [at issue].").  Here, there are no allegations in the Amended Complaint that even suggest that Tribune was involved in Newsday's actions in any way.  Accordingly, Plaintiffs' antitrust claims (counts one through ten) are dismissed as against Tribune.[2]

   In their opposition papers, Plaintiffs assert that "discovery will demonstrate that Tribune employees directed and controlled the activities of Newsday employees and themselves engaged in overt acts in furtherance of the antitrust violations."  (Pls.' Opp'n to Tribune's Mot. at 6.)  This argument puts the cart before the horse and ignores the fact that discovery has to be tied to a pleading which passes muster under Rule 12(b)(6).  As discussed *infra*, however, the Court grants Plaintiffs leave to amend so that they may cure any pleading defects consistent with this decision.  Accordingly, to the extent any such amendment asserts antitrust claims against Tribune, the allegations shall be sufficiently particularized so as to delineate Tribune's role in any alleged anticompetitive conduct.

### III. Interstate Commerce

   Newsday asserts that all of Plaintiffs' antitrust claims should be dismissed for

---

 [2]  Plaintiffs' remaining claims against Tribune will be discussed *infra*.

failure to allege subject matter jurisdiction. To assert a claim under the Sherman Act, a plaintiff must establish jurisdiction by satisfying the Act's commerce requirement. *See* 15 U.S.C. §§ 1 and 2 (governing "commerce among the several States").[3] The "scope of antitrust jurisdiction is broad indeed and 'encompasses far more than restraints on trade that are motivated by a desire to limit interstate commerce or that have their sole impact on interstate commerce.'" *Hamilton Chapter*, 128 F.3d at 66 (quoting *Hospital Building Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 743 (1976)). "The commerce requirement of the Sherman Act may be satisfied in two distinct ways: (1) where the defendant's conduct directly interferes with the flow of goods in the stream of commerce (the 'in commerce test'); or (2) where the defendant's conduct has a substantial effect on interstate commerce (the 'effect on commerce' test)." *Id.* at 66-67 (quoting *McLain v. Real Estate Board of New Orleans, Inc.*, 444 U.S. 232, 242 (1980)). With regard to the latter standard, Plaintiffs are not required to demonstrate a "causal link between the unlawful conduct and interstate commerce." *Id.* at 67; *see also McLain*, 444 U.S. at 242-43 ("Petitioners need not make the more particularized showing of an effect on interstate commerce caused by the alleged conspiracy . . .or by those other aspects of respondents' activity that are alleged to be unlawful."). Rather, "the inquiry is whether the aspects of the defendant's business that are infected by the allegedly unlawful conduct can reasonably be expected, as a matter of practical economics, to have a not insubstantial effect on interstate commerce." *Id.* (citations omitted).

Here, Plaintiffs rely on the following allegations in the Amended Complaint to

---

[3] Where, as here, a jurisdictional challenge is made to the pleading, "the analyses under Rule 12(b)(1) and Rule 12(b)(6) merge: the critical inquiry is into the adequacy of plaintiff's allegations that the challenged conduct affects interstate commerce." *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College*, 128 F.3d 59, 63 (2d Cir. 1997)

demonstrate jurisdiction:

> [Newsday and Tribune] (1) publish substantial quantities of state[,] national and international news, (2) pay substantial sums for such news and for material shipped to it from various parts of the United States and the rest of the world, (3) carry a substantial quantity of national advertising sent throughout the United States, (4) are involved in many transactions in interstate or foreign commerce regarding shipments and payments for the foregoing, and (5) place their product in an online format intended especially for individuals or groups located in states other than New York and countries other than the United States.

(Am Compl. ¶ 4.)  In addition, in their memorandum of law in opposition to Newsday's motion, Plaintiffs assert that to the extent the Court finds Plaintiffs' allegations lacking, they can easily cure any defect by amending their allegations to state that "the purchase of new automobiles by the automobile dealer parties . . . from manufacturers in Detroit, Michigan; Japan; Korea; Germany; France; Italy; and The United Kingdom, for resale from their Long Island automobile dealerships, is in interstate commerce."  (Pls.' Mem. in Opp'n to Newsday's Mot. at 9-10.)

Accepting Plaintiffs' allegations as true, the Court finds that they are sufficient to establish antitrust jurisdiction.  Although Defendants correctly point out that there are other allegations in the pleading that suggest that the effects of Defendants' conduct are felt on a purely local level, (*see* Am. Compl. ¶¶ 80-81 (noting that the geographical market is limited to Long Island as most car customers on Long Island typically do not travel outside Long Island to locate a new car dealer)), the jurisdictional allegations do suggest that there are "aspects of [Newsday's] business that are infected by the allegedly unlawful conduct," *Hamilton Chapter*, 128 F.3d at 667, i.e., its advertisements, that can reasonably be expected to effect interstate commerce in a substantial way.  (*See, e.g.*, *id.* ¶ 4 (alleging that Newsday carries a "substantial quantity of national advertising sent throughout the United States").)

Moreover, the facts Plaintiffs have articulated in support of a potential amendment lend further support to a finding that Defendants' activities implicate interstate commerce. *Cf. Lorain Journal Co. v. United States*, 342 U.S. 143, 150-52 (1955) (finding local newspaper's actions affected interstate commerce where paper disseminated significant amounts of news from out-of-state and advertised many goods manufactured out-of state); *Taxi Weekly, Inc. v. Metropolitan Taxicab Bd. of Trade, Inc.*, 539 F.2d 907, 910 (2d Cir. 1976) (because advertisers of local paper were "largely manufacturers of cars and automotive parts who produced at and delivered from plants outside of New York state, . . . [local paper] was an instrument of interstate commerce."). Although these facts are not pled in the Amended Complaint, because the Court is granting Plaintiffs leave to amend, any further amendment shall include these additional jurisdictional allegations.

In sum, the Court finds that Plaintiffs have adequately alleged antitrust jurisdiction under the Sherman Act but may amend their pleading to further particularize their jurisdictional claims.

## IV.    *Standing*

Newsday argues that Plaintiffs lack standing to assert antitrust claims relating to the "newspaper advertising sales market." In order to have standing to bring a private antitrust action, a plaintiff must allege both antitrust injury and antitrust standing. *See Balaklaw v. Lovell*, 14 F.3d 793, 798 n.9 (2d Cir. 1994). Antitrust injury signifies more than just a personal injury. *See id.* at 797. Rather, "'Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of

anticompetitive acts made possible by the violation.'" *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). This requirement "underscores the fundamental tenet that [t]he antitrust laws . . . were enacted for the protection of *competition*, not *competitors*." *Id.* (citations and internal quotation marks omitted); *see also Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993) ("Insisting on proof of harm to the whole market fulfills the broad purpose of the antitrust law that was enacted to ensure competition in general, not narrowly focused to protect individual competitors. Were the law construed otherwise, routine disputes between business competitors would be elevated to the status of an antitrust action, thereby trivializing the Act because of its too ready availability.").

Once a plaintiff has established an antitrust injury, he must then demonstrate that he is a "proper plaintiff," i.e., that based on factors such as the directness and identifiability of his injuries, the plaintiff will be "an efficient enforcer of the antitrust laws." *See Balaklaw*, 14 F.3d at 798 n.9. The Supreme Court has identified several factors to consider in determining whether a particular plaintiff has "antitrust standing." *Associated General Contractors of Ca., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 537-44 (1983). They include: (1) the causal connection between an antitrust violation and the alleged harm suffered by the plaintiff; (2) the nature of plaintiff's antitrust injury; (3) the directness or indirectness of the asserted injury; (4) the existence of an identifiable class of persons other than plaintiff who were more direct victims of the antitrust violation, and (5) the potential for duplicative recovery or complex apportionment of damages. *Id.* at 537-44; *see also Balaklaw*, 14 F.3d at 798 n.9.

Under these analyses, Plaintiffs have standing as they allege both that

Defendants' conduct violated the antitrust laws and that Plaintiffs were directly injured by that conduct when they purchased advertisements at artificially inflated prices. As to the first requirement, antitrust injury, Plaintiffs allege more than a personal injury; rather, they allege that Defendants' actions have had an actual adverse effect on competition as a whole in the relevant market, i.e., the newspaper advertising sales market. (*See, e.g.*, Am. Compl. ¶¶ 48-49 (alleging that Newsday acquired publications that were actual or potential competitors in the relevant market thereby reducing competition); *id.* ¶ 51 (alleging that Newsday refused to accept advertisements from any merchant who advertised in a competing publication known as "Suffolk Life"); *id.* ¶ 56 (alleging that Newsday's agreement with the Preferred Group resulted in termination of a competing publication Price Finder); *id.* ¶¶ 57-58 (detailing alleged agreement between Newsday and Preferred Group which resulted in artificially inflated prices for any advertiser not part of preferred Group).)

As to antitrust standing, Defendants argue that Plaintiffs are not proper plaintiffs because they do not allege that they were injured as a result of Newsday's alleged anti-competitive conduct. In this regard, Defendants assert that Plaintiffs have not alleged that they ever sought to advertise in the publications Newsday allegedly sought to injure/acquire. The flaw in this argument, however, is that regardless of this omission from the pleading, Plaintiffs still allege direct injury resulting from Defendants' actions in the form of being charged higher prices as a result of reduced competition for advertising. Accordingly, the Court finds that Plaintiffs have set forth sufficient facts to state antitrust standing. *See Twombley v. Bell Atl. Corp.*, 425 F.3d 99, 112 (2d Cir. 2005) (stating that pleading burden required to state antitrust claim is "relatively modest").

## V.       *Plaintiffs' Allegations of Antitrust Conspiracy*

All Defendants move to dismiss Plaintiffs' antitrust claims on the ground that

Plaintiffs' conspiracy claims are implausible.  More specifically, Defendants argue that it would

be contrary to the economic self-interest of Staluppi and the Preferred Group to conspire with

Newsday to eliminate Newsday's competition in the sale of automotive advertising on Long

Island, i.e., Price Finder, because Staluppi and the Preferred Group, as Long Island car dealers,

are customers in that market and thus would stand to gain by increased competition therein.  As

further explained by Staluppi:

> In essence, plaintiffs allege that [Staluppi] agreed to
> remove itself as a competitor of Newsday in the market for
> automobile advertising, in exchange for discounts to [Staluppi] as
> a customer in that market.  But it would make absolutely no sense
> for [Staluppi] to agree to such a plan, where the object of the
> purported conspiracy would be to give [Staluppi's] supplier,
> Newsday, monopoly power over the very market in which
> [Staluppi] would remain a customer.

(Staluppi's Mem. at 6.)

In analyzing the alleged antitrust conspiracy, the Court is cognizant of the Second

Circuit's admonition against dismissing such claims at this early stage of the litigation:

> To survive a Rule 12(b)(6) motion to dismiss . . . [t]he factual
> predicate that is pleaded does need to include conspiracy among
> the realm of plausible possibilities . . . . But short of extremes of
> bare bones and implausibility, a complaint in an antitrust case need
> only contain the short and plain statement of the claim showing
> that the pleader is entitled to relief that Rule 8(a) requires.

*Twombley*, 425 F.3d at 111 (citations and internal quotation marks omitted).  Here, Defendants'

argument that the Preferred Group has nothing to gain from the elimination of Newsday's

competitors ignores one possible interpretation of the pleading which is that the alleged

12

conspiracy enables the Preferred Group to achieve a dangerous probability of acquiring monopoly power in new automobile sales on Long Island. Given Plaintiffs' allegation that Newsday is the single most important source of advertising for car dealerships on Long Island, (*see* Am. Compl. ¶¶ 66-67, 72), foregoing Price Finder may have been a small price to pay in exchange for the benefits reaped via the deep discounts the Preferred Group allegedly received on Newsday advertising. Thus, contrary to Defendants' assertions, the Court finds that Plaintiffs' conspiracy claims are not "wholly implausible" and therefore denies Defendants' motion to dismiss this claim. Of course, Defendants are free to move for summary judgment on this claim after discovery. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002) ("Furthermore, Rule 8(a) establishes a pleading standard without regard to whether a claim will succeed on the merits. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.") (citation and internal quotation marks omitted).

## VI.     Plaintiffs' Predatory Pricing Claim

Plaintiffs' fifth cause of action asserts a violation of section 2 of the Sherman Act based upon alleged predatory pricing. To state a claim of monopolization under section 2, a plaintiff must demonstrate: "(1) the defendant had monopoly power in the relevant market; (2) the defendant engaged in anticompetitive conduct; and (3) its injury was, in fact, caused by the defendant's violation of the antitrust laws." *Irvin Indus., Inc. v. Goodyear Aerospace Corp.*, 974 F2d 241, 244 (2d Cir. 1992) (citations and internal quotation marks omitted). Predatory pricing is one way a plaintiff may establish the second element. *Id.*

"Predatory pricing may be defined as pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the

long run." *Cargill, Inc. v. Montfort of Colorado, Inc.*, 479 U.S. 104, 117 (1986).  Predatory

pricing occurs in three phases:

> First, a seller temporarily cuts his price with the intent of
> eliminating his competitors or deterring potential competitors from
> entering the market. Second, the damage to or discouragement of
> competitors enables the predator to create or maintain a monopoly.
> Third, the predator recoups revenues lost through the temporary
> price cut by charging higher, monopoly prices.  When a predatory
> pricing allegation is advanced soon after the price cut, the issue is
> whether that price cut is part of a predatory pricing scheme. The
> price cut may simply reflect the seller's efficiency or efforts to
> break into a competitive market.  Moreover, if the market structure
> renders recoupment of profits lost during the price cut phase
> difficult or risky, it may be unlikely that the seller's price cut is
> predatory.

*Irvin Indus.*, 974 F.2d at 244 (citations omitted).  Thus, "a plaintiff seeking to establish

competitive injury resulting from a rival's low prices must prove that the prices complained of

are below an appropriate measure of its rival's costs" and "that the competitor had a . . .

dangerous probability[] of recouping its investment in below-cost prices."  *Brooke Group Ltd. v.

Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222, 224 (1993).  Furthermore, as noted by

the Supreme Court:

> [P]redatory pricing schemes are rarely tried, and even more rarely
> successful, and the costs of an erroneous finding of liability are
> high. The mechanism by which a firm engages in predatory
> pricing--lowering prices--is the same mechanism by which a firm
> stimulates competition; because cutting prices in order to increase
> business often is the very essence of competition . . .  mistaken
> inferences . . . are especially costly, because they chill the very
> conduct the antitrust laws are designed to protect.  It would be
> ironic indeed if the standards for predatory pricing liability were so
> low that antitrust suits themselves became a tool for keeping prices
> high.

*Id.* at 226-27 (citations and internal quotation marks omitted).

Here, all Defendants move for dismissal of this claim.  As an initial matter, the

Court finds that this claim cannot be sustained as against Staluppi as Plaintiffs do not, and

cannot, allege that Staluppi is charging prices in the automobile advertising market below its

costs or that Staluppi has a dangerous probability of recouping its investment in below-cost

prices.  Simply put, Staluppi is alleged to be a an owner and operator of car dealerships, not a

supplier of automobile advertisements.  In fact, the whole basis of Plaintiffs' purported

anticompetitive conspiracy between Newsday and Staluppi is premised upon Staluppi no longer

competing in the Long Island automobile advertising market.  Although it is alleged that

Staluppi published Price Finder at some unidentified time, it is further alleged that Price Finder

"ceased to exist" pursuant to Staluppi's agreement with Newsday.  (*Id.* ¶ 56.)  Nowhere do

Plaintiffs claim that while Staluppi was publishing Price Finder, it cut Price Finder's prices for

the purpose of eliminating competition.  Accordingly, Plaintiffs' claim of predatory pricing is

dismissed as to Staluppi.

The analysis with respect to Newsday is not as simple.  The Amended Complaint

alleges that Newsday

> charged prices for certain dealers at levels less than Newsday's
> reasonably anticipated average marginal cost or its reasonably
> anticipated average variable cost of such advertising [with] the
> expectation that it would be able to recoup its lost profits for
> Newsday's predatory pricing by charging excessive fees for
> advertising to its other advertisers, including Plaintiffs, as a result
> of its dominant position in the relevant markets, including the
> Long Island automobile advertising market.

(Am. Compl. ¶¶ 131, 134.)  In their opposition papers, Plaintiffs expound on this theory by

asserting that "the reason why Newsday agreed to steeply discounted prices for automotive

advertising exclusively for Staluppi and the Preferred Group, was to eliminate the threat to

Newsday's monopoly position as the 'sole source' of automotive advertising on Long Island, represented by Staluppi's introduction of 'Price Finder[]' as a direct mail medium of automotive advertising in competition with Newsday."  (Pls.' Opp'n to Newsday's Mot. at 17 (citing Am. Compl. ¶¶ 53-59).)

Newsday argues, inter alia, that Plaintiffs' theory of predatory pricing does not fall within the ambit of that doctrine as it has been defined by the case law.  As noted above, the essence of a predatory pricing scheme entails a seller temporarily lowering prices below costs, thereby driving out the competition or deterring potential competitors from entering the market, and enabling the seller to maintain monopoly power long enough to recoup losses through the subsequent charging of higher, monopoly prices.  *See Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.8, 589 (1986).  Here, although Plaintiffs have articulated a general allegation that Newsday priced its rates for advertising below cost, this discount was offered to members of the Preferred Group only.  Other car dealerships, including Plaintiffs, were not only not offered this discount but allegedly paid "excessive" rates.  (Am. Compl ¶ 64.) It is therefore unclear how this selective discount would enable Newsday to create or maintain a monopoly through below-cost prices as by Plaintiffs' own account, there remain a large group of dealers, including Plaintiffs, who are paying above-market rates.  This fact alone would seem to undercut Plaintiffs' theory that Newsday's actions constitute predatory pricing.

Plaintiffs, however, allege more than just a price differential between them and the Preferred Group.[4]  They also allege that this scheme enabled Newsday to maintain a

_____

[4]  Price discrimination, charging different buyers different prices for the same products, is not a cognizable claim under the Sherman Act, *see State of N.Y. v. Mobil Oil Corp.*, 38 N.Y.2d 460, 463 (1976), and instead, may be brought under the Robinson-Patman Act.  *See George*

monopoly by eliminating Price Finder and that any losses sustained by virtue of the low prices offered to the Preferred Group were recouped via the higher prices offered to Plaintiffs. *Cf. Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 n.9 (1990) ("This is not to deny that a vertical price-fixing scheme may facilitate predatory pricing. A supplier, for example, can reduce its prices to its own downstream dealers and share the losses with them, while forcing competing dealers to bear by themselves the full loss imposed by the lower prices.") (citing *FTC v. Sun Oil Co.*, 371 U.S. 505, 522 (1963)). Thus, to the extent a predatory pricing scheme requires Plaintiffs to allege that "the prices complained of are below an appropriate measure of [Newsday's] costs" and "that [Newsday] had a . . . dangerous probability[] of recouping its investment in below-cost prices," *Brooke Group Ltd.*, 509 U.S. at 222, 224, Plaintiffs have satisfied their burden. That being said, the Court recognizes that Plaintiffs' theory differs from the manner in which predatory pricing has chiefly been used in the case law, i.e, one competitor suing another for pricing below costs and driving the former out of the market. Moreover, given Plaintiffs' allegation that many dealers, including Plaintiffs, paid inflated rates, it is unclear whether this alleged scheme would result in any loss to Newsday. *See Matsushita*, 475 U.S. at 588 ("Any agreement to price below the competitive level requires the conspirators to forgo

---

*Haug Co. v. Rolls Royce Motors Cars, Inc.*, 148 F.3d 136, 140 (2d Cir. 1998) ("The [Robinson-Patman] Act requires that each purchaser be given an 'equal opportunity' by the seller to receive the benefit of higher or lower prices."). Here, Plaintiffs do not assert claims for price discrimination under the Robinson-Patman Act, presumably because the Act's prohibition on price discrimination extends only to transactions involving "commodities" which do not include newspaper advertising. *See Innomed Labs, LLC v. ALZA Corp.*, 368 F.3d 148, 156 (2d Cir. 2004) (citing *Ambook Enters. v. Time Inc.*, 612 F.2d 604, 609-10 (2d Cir. 1979)). Newsday argues that Plaintiffs' predatory pricing claim is really no more than a claim of price discrimination. But as discussed above, the Court finds that Plaintiffs' alleged scheme may constitute more than mere price discrimination.

profits that free competition would offer them. The forgone profits may be considered an investment in the future."); *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 55 (2d Cir. 1979) (finding no basis for finding of predatory acts absent evidence that challenged practice would "produce even a short-term loss for the [defendant's] operations taken as a whole"). Nonetheless, at this stage of the litigation, and based on the papers submitted, the Court declines to dismiss Plaintiffs' predatory pricing claim.

### VII. *Plaintiffs' Claims Pertaining to the New Automobile Sales Market*

Plaintiffs' sixth, seventh, and eighth causes of action seek redress for alleged anticompetitive harm in the "new automobile sales market." Specifically, Plaintiffs contend that Defendants have: (1) conspired to restrain trade in this market in violation of section 1 of the Sherman Act (sixth cause of action); and (2) conspired to monopolize this market in violation of section two of the Sherman Act (seventh and eighth causes of action). The Court will address Plaintiffs' claims separately.

### A. The Eighth Cause of Action

#### 1. Claims Against Newsday

Working backwards, the Court finds that Plaintiffs' eighth cause of action for attempted monopolization of the new automobile sales market as against Newsday is clearly deficient. To state such a claim, Plaintiffs must allege: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *see also Twombley*, 506 U.S. at 456. "In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the

relevant market and the defendant's ability to lessen or destroy competition in that market." *Id.* In this regard, the Second Circuit has held that "it is axiomatic that a firm cannot monopolize a market in which it does not compete." *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1062 (2d Cir. 1996), *vacated on other grounds*, *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998).

Here, according to the Amended Complaint, Plaintiffs and Staluppi sell cars on Long Island. (Am. Compl ¶¶ 8, 11.) Newsday, on the other hand, publishes a newspaper and sells advertising space in that newspaper. (*Id.* ¶¶ 10, 12, 15.) There is no allegation in the Amended Complaint that Newsday has any presence whatsoever in the Long Island automobile sales market, much less any allegation that Newsday possesses market power in that market. Although there are allegations that Newsday conspired with the Preferred Group to monopolize the new automobile sales market, these allegations are insufficient to state a claim for monopolization or attempted monopolization. Although "[a] defendant may be liable for conspiracy to monopolize where it agrees with another [company] to assist that [company] in its attempt to monopolize the relevant market," *see Discon*, 93 F.3d 1062, a defendant may only be held liable for monopolization or attempted monopolization if the *defendant itself* competed directly in that market. *Id.*; *see also Tops Markets, Inc. v. Quality Markets, Inc.*, No. 93-CV-0302E, 2000 WL 1160466, at *11 (W.D.N.Y. Aug. 10, 2000) ("The end result of an attempted monopolization – as contrasted with a conspiracy to monopolize [] – is not simply that the relevant market be monopolized but that the defendant be the monopolizer.") (citing *Discon*, 93 F.2d at 1062). Accordingly, because there are no allegations that Newsday competes in the new automobile sales market, Plaintiffs' eighth cause of action, for attempted monopolization of this market, is dismissed as to Newsday.

### 2.      *Claims Against Staluppi*

The eighth cause of action alleges that Staluppi attempted to monopolize the new automobile sales market.  As noted above, one of the elements of such a claim is that the defendant has a "a dangerous probability of achieving monopoly power."  *Spectrum Sports,* 506 U.S. at 456.  The Second Circuit has repeatedly noted that "[a] threshold showing for a successful attempted monopolization claim is sufficient market share by the defendant because a defendant's market share is the primary indicator of the existence of a dangerous probability of success."  *AD/SAT, a Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 226 (2d Cir. 1999) (citations and internal quotation marks omitted); *see generally Commercial Data Servers, Inc. v. IBM Corp.*, 262 F. Supp. 2d 50, 74 (S.D.N.Y. 2003) ("Courts have consistently held that firms with market shares of less than 30% are presumptively incapable of exercising market power.") (citations and internal quotation marks omitted).

Here, Plaintiffs allege that Staluppi owns and operates a number of car dealerships on Long Island, including fifteen specifically identified dealerships.  (Am. Compl. ¶ 11.)  Plaintiffs further allege that "Defendants . . . control such a substantial share of the relevant [market]," (*id.* ¶ 159), and that the Preferred Group, which includes Staluppi, "dominates the consumer market for new car sales on Long Island."  (*Id.* ¶ 93.)  Although these allegations do not specify Staluppi's exact share of the alleged Long Island market for new automobile sales, the Court finds they easily pass muster under Rule 12(b)(6).  As noted by Plaintiffs, Staluppi's exact market share is an issue that can be further developed in discovery.  Accordingly, Staluppi's motion to dismiss the eighth cause of action on this basis is denied.

**B.** **_The Sixth and Seventh Causes of Action_**

Newsday does not move to dismiss Plaintiffs' sixth or seventh causes of action on the ground that it does not compete in the new automobile sales market, presumably because these claims involve allegations of conspiracy and Newsday, although not in the new automobile market, may nonetheless be held liable for conspiracies related thereto.  (_See_ Newsday's Reply at 8 n.7.)  Instead, Newsday moves to dismiss these claims based upon Plaintiffs' failure to adequately define this market.

As a prerequisite to any antitrust claim, Plaintiffs must allege a relevant product market which Defendants' antitrust activities are alleged to have affected.  _See Marchon Eyewear, Inc. v. Tura LP_, No. 98 CV 1932, 2002 WL 31253199, at *5 (E.D.N.Y. Sept. 30, 2002); _Smith & Johnson, Inc. v. Hedaya Home Fashions Inc._, No. 96 Civ. 5821, 1996 WL 737194, at *5 (S.D.N.Y. Dec. 26, 1996) "Without a definition of the relevant product market, there is no way to measure a company's ability to act as a monopolist." _United States v. Eastman Kodak Co._, 63 F.3d 95, 104 (2d Cir 1995).  "Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." _Todd v. Exxon Corp._, 275 F.3d 191, 199-200 (2d Cir. 2001).  "There is, however, no absolute rule against the dismissal of antitrust claims for failure to allege a relevant product market." _Id._ at 200.

Here, the Amended Complaint lists "new automobile sales" as a relevant market, (Am. Compl. ¶ 65(c)), but fails to offer _any_ allegations describing this market.  In their opposition papers, Plaintiffs do not deny the absence of any specific allegations but instead argue that Newsday's demand that Plaintiffs comply with "technical pleading requirements" is no more

than an attempt by Defendants to "elevate [such requirements] above substance, common sense and legal precedent." (Pls.' Mem. in Opp'n to Newsday's Mot. at 18.) The Court disagrees.

"To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes--analysis of the interchangeability of use or the cross-elasticity of demand[5], and it must be plausible." *Todd*, 275 F.3d at 200 (citations and internal quotation marks omitted). Here, the pleading is devoid of any factual allegations which suggest that these prerequisites have been met. Especially glaring is the absence of any allegations as to why Plaintiffs' market should be limited to "new automobiles." *See Todd*, 275 F.3d at 200 (noting that dismissal is appropriate when complaint fails to "even . . . attempt a plausible explanation as to why a market should be limited in a particular way").

Furthermore, Plaintiffs' suggestion that they are relieved of the obligation to include market definition allegations in the Amended Complaint because other courts have found new automobile sales to be a relevant market is clearly misguided. The issue is not whether new automobile sales can ever be recognized as a valid market; rather, the issue is whether under the present facts, Plaintiffs have properly pled this to be the case.

In sum, because Plaintiffs make no effort to define the "new automobile sales" market they name in their Amended Complaint, their sixth and seventh causes of action are dismissed. However, because there is nothing to suggest that if properly pled, Plaintiffs could not state viable claims, as discussed *infra*, the Court grants Plaintiffs leave to amend so that

---

[5] Cross-elasticity of demand refers to "the extent to which consumers will change their consumption of one product in response to a price change in another." *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 469 (1992).

Plaintiffs may cure these pleading defects.

## VIII.   *Plaintiffs' Claims Pertaining to the Long Island Automotive Advertising Market*

Staluppi moves to dismiss Plaintiffs' third and fourth causes of action for attempt to monopolize and monopolization with regard to the Long Island automotive advertising market.  To state a claim for monopolization, Plaintiffs must allege, inter alia, that Defendants possess monopoly power in a relevant market.  *See United States v. Grinnell Corp.*, 384 U.S. 563, 570 (1966).  Furthermore, as noted above, to state a claim for attempted monopolization, Plaintiffs must allege, inter alia, that Defendants have a "dangerous probability of achieving monopoly power."  *Spectrum Sports*, 506 U.S. at 456.

Here, Plaintiffs claim that as a result of the purported agreement between Staluppi and Newsday, Staluppi's "competing publication Price Finder ceased to exist."  (Am. Compl. ¶ 56.)  Therefore, Plaintiffs themselves allege that Staluppi does not compete in the relevant market and, accordingly, Staluppi's motion to dismiss counts three and four is granted.

## IX.   *Plaintiffs' Claims Under the Donnelly Act*

Plaintiffs' ninth and tenth causes of action assert claims under New York's antitrust statute, the Donnelly Act, N.Y. General Business Law §§ 340 et seq.  Defendants move to dismiss these claims on the ground that they "track" Plaintiffs' federal antitrust claims and should be dismissed if the latter claims are dismissed.  Because the Court has not dismissed Plaintiffs' claims under the Sherman Act in their entirety, Defendants' motion to dismiss Plaintiffs' claims under the Donnelly Act is denied.

## X.   *Plaintiffs' Claims Under the Lanham Act*

Plaintiffs' eleventh cause of action asserts a claim against defendants Newsday

and Tribune under section 43 of the Lanham Act, 15 U.S.C. § 1125, based upon defendants' alleged "materially false and misleading statements of fact in advertising their circulation volumes to purchasers of their new car automotive print advertising, including the Plaintiffs" (Am. Compl. ¶ 188.) "[T]o have standing for a [Lanham Act] false advertising claim, the plaintiff must be a competitor of the defendant and allege a competitive injury." *Telecom Int'l Am., Ltd. v. AT & T Corp*., 280 F.3d 175, 1997 (2d Cir. 2001) (citations and internal quotation marks omitted). Here, Plaintiffs do not compete with Newsday or Tribune. Rather, they are merely consumers. Accordingly, Plaintiffs' Lanham Act claims are dismissed. *See Hassan v. Spicer*, No. O5-CV-1526, 2006 WL 228958, at *5 (E.D.N.Y. Jan. 31, 2006) (dismissing Lanham Act claim where plaintiff and defendant not competitors); *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 659 (S.D.N.Y. 1996) (consumer standing would transform "the federal court system into a veritable small claims court.") (citations and internal quotation marks omitted), *aff'd*, 113 F.3d 1229 (2d Cir. 1997).

## XI.  *Plaintiffs' State Law Claims*

As noted above, Plaintiffs' state law claims are asserted against Newsday and Tribune only. The Court will discuss them in turn.[6]

### A.  *Fraud*

The twelfth cause of action asserts a claim of fraud based upon Newsday's and Tribune's alleged false representations regarding Newsday's circulation figures. Plaintiffs allege that they justifiably relied on these misrepresentations to their detriment and "paid more for

---

[6] Defendants do not move to dismiss the thirteenth cause of action for unjust enrichment. Accordingly, the Court will not address this claim.

placing ads in Newsday than they would have if the true and accurate circulation volumes had been reported to ABC and to the general public."  (Am. Compl. ¶ 199; *see also id.* ¶¶ 195-204.)

Defendants argue that Plaintiffs fail to state a claim for fraud because the alleged misrepresentations were not made by Tribune or Newsday *to* Plaintiffs; rather they were made to an independent auditing company known as ABC.  (*See* Am. Compl. ¶ 18, at 6 ("[T]he rates charged by Newsday for its automotive print advertising were based on the circulation volume represented by Newsday and its distributors to . . . ABC.").)  Defendants contend that a claim for fraud cannot be premised upon statements made to a third party.  Defendants are mistaken.

Preliminarily, the Court notes that it is unclear from the pleading which entity actually relayed the alleged false representations regarding Newsday's circulation figures to the general public, including Plaintiffs.  (*See id.* ¶¶ 196-98 (suggesting Newsday and Tribune made the misrepresentations).)  Moreover, in opposition to the instant motions, Plaintiffs submit copies of Tribune's Annual Reports for the years 2000 through 2003 and ask the Court to take judicial notice of the fact that these filings contain the artificially inflated circulation figures, which according to Plaintiffs, helped "further[] the overcirculation fraud."  (Pls.' Mem. in Opp'n Tribune's Mot. at 6.)  Although it is more likely that Plaintiffs obtained this information from ABC rather than from Tribune's Annual Reports, it is possible that Plaintiffs learned of these figures therefrom.  Thus, the Annual Reports undermine Tribune's argument that the representations were not made directly from Tribune to Plaintiffs.

More importantly, however, and contrary to Defendants' assertions, New York law does permit recovery for misrepresentations made to third parties under limited circumstances.  *See Securities Inv. Protection Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 76-77

(2d Cir. 2000) ("[T]o recover in New York for misrepresentations made to a third party, the plaintiff must establish that he or she relied to his or her detriment on the misrepresentations and that the defendant intended those misrepresentations to be communicated to the plaintiff.").  As noted by the Second Circuit:

> Analyzing the reliance element in third-party fraud cases, several decisions have suggested that a plaintiff may demonstrate reliance where the third party does not directly repeat the defendant's misrepresentations to the plaintiff, but rather communicates them in a repackaged or summary form, on which the plaintiff then relied.  In *Tindle v. Birkett*, 171 N.Y. 520, 64 N.E. 210 (1902) for example, the New York Court of Appeals permitted recovery for misrepresentations made by the defendants to a credit rating agency for purposes of receiving a favorable rating. The plaintiffs never received those misrepresentations directly, but rather relied on the favorable credit rating the agency had formulated using the defendants' misinformation. *See id.* at 522-23, 64 N.E. 210. The Court of Appeals found that because the plaintiffs extended credit to the defendants "in reliance on the correctness of the rating, without any other knowledge [of the defendant's financial situation]," they had established the reliance necessary to sustain a fraud claim against the defendant.  *Id.* at 523, 64 N.E. 210.

*Id.* at 77.  Here, to the extent Plaintiffs allege that Newsday reported false circulation figures to ABC, which in turn relayed these misrepresentations to Plaintiffs in anticipation of their reliance, these allegations would clearly fall within the ambit of third-party liability as enunciated above. Accordingly, Tribune's and Newsday's motion to dismiss the fraud count is denied.

**B.      Negligence Misrepresentation**

Plaintiffs' fourteenth cause of action asserts a claim for negligent misrepresentation based upon the same set of facts upon which Plaintiffs' fraud claim is grounded.  To recover for negligent misrepresentation under New York law, a plaintiff must satisfy the following elements:

> (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

*Hydro Invs., Inc. v. Trafalgar Power, Inc.,* 227 F.3d 8, 20 (2d Cir. 2000) (citations omitted).

Defendants argue that Plaintiffs' claim must fail because they have not alleged facts which would create a special relationship among the parties so as to give rise to a duty of care. "A duty of care may arise when there is actual privity of contract between the parties or a relationship so close as to approach that of privity, or if the defendant has fiduciary obligations to the plaintiff." *Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 584 (2d Cir. 2005) (citations and internal quotation marks omitted).

> A relationship is considered "so close as to approach that of privity" when the following criteria are met: 1) the defendant makes a statement with the awareness that the statement was to be used for a particular purpose; 2) a known party or parties rely on this statement in furtherance of that purpose; and 3) there is some conduct by the defendant linking it to the party or parties and evincing defendant's understanding of their reliance.

*Id.* (citing *Ossining Union Free School Dist. v. Anderson LaRocca Anderson*, 73 N.Y.2d 417, 425 (1989) and *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536 (1985), *order amended on other grounds*, 66 N.Y.2d 812 (1985)); *see also Prudential Ins. Co. of Am. v. Dewey, Ballantine, Bushby, Palmer & Wood*, 80 N.Y.2d 377, 382 (1992) (same).

"In New York, 'not all representations made by a seller of goods . . . will give rise to a duty to speak with care.'" *Dallas Aerospoce, Inc. v. CIS Air Corp.*, 352 F.3d 775, 788 (2d Cir. 2003) (quoting *Kimmell v. Schaefer*, 89 N.Y.2d 257 (1996)). "Instead, the law of negligent

misrepresentation requires a closer degree of trust between the parties than that of the ordinary buyer and seller in order to find reliance on such statements justified." *Id.*

Here, the Court finds that Plaintiffs have sufficiently alleged a relationship of privity or of that approaching privity between Plaintiffs and Newsday. As an initial matter, the Amended Complaint alleges that "several of the Plaintiffs had entered into advertising contracts with Newsday prior to the commencement of this lawsuit." (Am. Compl. ¶ 31a.) Thus, these Plaintiffs were clearly in privity with Newsday. As for the other Plaintiffs, the Amended Complaint alleges that they purchased automobile advertising from Newsday as well, but not directly; instead, they purchased advertising through agencies authorized to sell on behalf of Newsday. (*Id.* ¶ 15.) Nonetheless, due to their purchases of Newsday advertising, Plaintiffs have alleged sufficient "conduct by [Newsday] linking it to [these Plaintiffs]" such that Newsday should have been aware that they intended to rely on Newsday's statements for the purpose of purchasing advertising. *Aetna Cas.*, 404 F.3d at 584; *cf. id.* ("In contrast, where the statement at issue is directed at a 'faceless of unresolved class or persons,' no duty of care arises.") (quoting *White v. Guarente*, 43 N.Y.2d 356 (1977)). Accordingly, Newsday's motion to dismiss this claim is denied.

As to Tribune, however, the pleading is not so clear. The allegations under the "FOURTEENTH CAUSE OF ACTION NEGLIGENT MISREPRESENTATION" offer no specifics as to Tribune's involvement. Moreover, the body of the Amended Complaint refers to "several" Plaintiffs contracting with "Newsday" and makes no reference to Tribune. However, Plaintiffs do assert a breach of contract claim, discussed *infra*, which alleges that "Defendants Tribune and Newsday and Plaintiffs entered into Classified Advertising Contracts for the purpose

of Plaintiffs' advertising in Newsday." (Am. Compl. ¶ 218.) Accepting this allegation as true, Plaintiffs would be in privity of contract with Tribune and the negligent misrepresentation claim could be sustained on that basis. Accordingly, Tribune's motion to dismiss this claim is denied. Plaintiffs, however, are directed to flesh out their allegations as to Tribune's relationship with Plaintiffs in their second amended complaint.

### C.      *Breach of Contract*

Plaintiffs' fifteenth cause of action is for breach of contract as against Tribune and Newsday. As noted above, the Amended Complaint alleges that Tribune, Newsday and Plaintiffs entered into contracts pursuant to which Plaintiffs would place advertisements in Newsday. (Am. Compl. ¶¶ 218.) It further alleges that "nine days after the filing of the instant action [July 21, 2004] . . . Defendants refused to accept and have not accepted Plaintiffs' advertising for Newsday" and thus have breached their contracts with Plaintiffs.[7] (*Id.* ¶ 219.)

Plaintiffs do not attach copies of the relevant contracts to the pleading. Nor do they submit copies in their opposition papers. Defendants Newsday and Tribune, however, submit a copy of "Newsday's standard classified advertising contract for 2003" with their moving papers. (Decl. of Andrea Rothchild, dated Dec. 2, 2004, ¶ 3.) Section 8(d) provides that Newsday "shall have the right to terminate this Agreement for any reason and at any time by written notice to Advertiser." (*Id.*) Thus, defendants argue, Plaintiffs' claim is belied by the terms of the actual advertising agreements they have signed.

In response, Plaintiffs argue that "[t]he contractual right to reject advertising

---

[7] As noted above, the parties entered into a stipulation on September 1, 2004, pursuant to which Plaintiffs would be permitted to advertise in Newsday during the pendency of this litigation.

relates to rejection of inappropriate content, not the unilateral right to disavow mutually binding contracts in retaliation for commencement of a lawsuit." (Pls.' Opp'n to Newsday's Mot. at 24.) They do not address section 8(d).

Although a court in deciding a Rule 12(b)(6) motion is generally limited to considering the facts alleged in the complaint, a district court may also consider documents that are attached to, incorporated by reference in, or integral to the complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002). Courts apply this exception where, as here, a plaintiff sues primarily on the basis of a document, such as a contract, and only attaches selected portions of that document, or fails to attach the document at all. *See International Audiotext Network, Inc. v. America Te. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir. 1995); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) ("In addition, we have held that when a plaintiff chooses not to attach to the complaint or incorporate by reference a prospectus upon which it solely relies and which is integral to the complaint, the defendant may produce the prospectus when attacking the complaint for its failure to state a claim, because plaintiff should not so easily be allowed to escape the consequences of its own failure.") (citing *I. Meyer Pincus and Assocs., P.C. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir. 1991)).

On its face, section 8(d) clearly states that Newsday may terminate the contract at any time. Moreover, there is a separate provision in the contract that provides that "[s]ubmission of an advertisement to [Newsday] does not constitute a commitment by [Newsday] to publish the advertisement. . . . Newsday has the right, in its sole and absolute discretion, to reject any advertisement or any portion thereof." (¶ 1(a).) Contrary to Plaintiffs' assertions, there is nothing in the contract that restricts Newsday's right to refuse to publish any advertisements submitted by

Plaintiffs to inappropriate content only. That being said, the Court has some reservations about universally applying this contract to dismiss all of Plaintiffs' breach of contract claims when there is no indication as to which Plaintiffs actually signed this agreement. In this vein, Newsday claims that this agreement was its standard advertising contract for 2003; Plaintiffs' ads ran from September 1995 through July 2004. (Am. Compl. ¶ 15.) Plaintiffs, however, at no point suggest that the agreement proffered by Newsday is not applicable to *all* of their claims. Accordingly, the Court grants defendants' motion to dismiss this claim but grants Plaintiffs leave to amend to the extent there are any plaintiffs whose contractual claims were not governed by the 2003 standard contract.

## XII. *Leave to Amend*

Plaintiffs argue that because "the Amended Complaint is the first pleading in this action that has been subject to a motion to dismiss, should the Court find any deficiencies in the Amended Complaint, Plaintiffs request the opportunity to cure any such deficiencies through a further amended pleading." (Pls.' Opp'n to Newsday's Mot. at 24.) The Court agrees.

Rule 15(a) of the Federal Rules of Civil Procedure provides in pertinent part that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). A motion to amend should be denied, however, "if there is an 'apparent or declared reason -- such as undue delay, bad faith or dilatory motive . . . , repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, [or] futility of amendment.'" *Dluhos v. Floating and Abandoned Vessel, Known as "New York"*, 162 F.3d 63, 69 (2d Cir. 1998) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

In determining whether proposed claims are futile, the Court is required to adopt

the same analysis as that applied on a motion to dismiss pursuant to Rule 12(b)(6). *Aetna Cas. and Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 604 (2d Cir. 2005). Here, with regard to several of Plaintiffs' claims that the Court has dismissed, Plaintiffs have proffered facts that if properly pled, would support viable causes of action. For example, Plaintiffs' failure to define the "new automobile sales market" can be easily cured via amendment. *See Valley Disposal, Inc. v. Central Vt. Solid Waste Mgmt. Dist.*, 31 F.3d 89, 97 (2d Cir. 1994) ("[W]e are loath to sustain the dismissal with prejudice of the two counts where the record so obviously reflects the means to remedy the pleading deficiency."); *Oliver Schools, Inc. v. Foley*, 930 F.2d 248, 253 (2d Cir. 1991) ("Where the possibility exists that the defect can be cured and there is no prejudice to the defendant, leave to amend at least once should normally be granted as a matter of course."). With regard to other claims, however, such as Plaintiffs' monopolization and attempted monopolization claims against Defendants in markets in which they clearly do not compete, the Court cannot conceive of any possible permutation on the facts as pled that might support an amendment. Accordingly, although the Court grants Plaintiffs' application for leave to amend, Plaintiffs are directed to do so consistent with the Court's decision. In addition, Plaintiffs are warned that failure to address the pleading concerns enunciated in this Order may result in dismissal with prejudice.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss the Complaint are GRANTED in part and DENIED in part. As to Tribune, the Court dismisses counts one through ten (federal and state antitrust claims), count eleven (Lanham Act claim), and count fifteen (breach of contract). As to Newsday, the Court dismisses counts six (violation of section 1 of the

32

Sherman Act eight with regard to the Long Island new automobile sales market), seven

(conspiracy to monopolize the Long Island new automobile sales market), eight (attempt to

monopolize the Long Island new automobile sales market), count eleven (Lanham Act claim), and

count fifteen (breach of contract).  Finally, as to Staluppi, the Court dismisses counts three

(attempt to monopolize the Long Island automotive advertising market), four (monopolization of

the Long Island automotive advertising market ), six (violation of section 1 of the Sherman Act

eight with regard to the Long Island new automobile sales market), seven (conspiracy to

monopolize the Long Island new automobile sales market), eight (attempt to monopolize the

Long Island new automobile sales market)[8] and eleven (Lanham Act claim).  Plaintiffs shall serve

and file their Second Amended Complaint within thirty days of the date of this Order.

      **SO ORDERED**

Dated: Central Islip, NY
     March 2, 2006


                /s_____
                Denis R. Hurley,
                United States District Judge

---

[8]  Although Staluppi did not move to dismiss counts six through eight on the basis that Plaintiffs failed to adequately define the Long Island new automobile sales market, given the Court's finding in this regard, these counts are dismissed in their entirety and Plaintiffs are granted leave to amend.